IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| DOUGLAS STEWART CARTER,<br><br>    Petitioner,<br><br><br><br><br><br>        vs.<br><br><br><br>ALFRED C. BIGELOW, Warden of the Utah State Prison,<br><br>        Respondent. | MEMORANDUM DECISION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS<br><br><br><br><br><br>Case No. 2:02-CV-326 |

Before the Court for consideration are the merits of the remaining claims in Petitioner Douglas Stewart Carter's Second Amended Petition for Writ of Habeas Corpus.[1]  After careful review and analysis of the arguments and evidence submitted by the parties, and for the reasons discussed below, the Court finds that Petitioner is not entitled to habeas relief and therefore denies his Petition.

---

[1]Docket No. 154.

## I.  FACTUAL BACKGROUND

On the evening of February 27, 1985, Eva Oleson was murdered in her Provo, Utah home.[2]  The last time her husband saw her alive, she was trimming the hair of their 16 year-old son in the kitchen so he could go bowling with his friends.[3]  A few hours later, her husband found her dead, her hands tied behind her back with a telephone cord that had been ripped from the wall, nude from the waist down, and with a kitchen knife on the floor next to her.[4]  Her pants and pantyhose were pulled down to her ankles, and her sanitary pad had been removed and also lay at her feet.[5]  Mrs. Oleson had eight stab wounds in her back, one in her abdomen, and one in her neck.[6]  Mrs. Oleson had a fatal gunshot wound to the back of her head.[7]  She was 57 years old.[8]

---

[2] *State v. Carter*, 888 P.2d 629, 633-34 (Utah 1995) (hereinafter *Carter II*).

[3] 1985 Trial Transcript at 643 (Bates 1082).  Petitioner provided the Court with two CDs of transcripts and documents from the state court proceedings.  *See* Docket No. 501.  The Court will refer to transcripts by identifying the hearing name, page number, and Bates stamp number, if available.  Petitioner also provided the Court with the records from Petitioner's 1985 Trial, 1992 Penalty Phase Hearing, and two state court post-conviction proceedings.  Where these records are available elsewhere in the record in this proceeding, the Court will cite to its own docket for the sake of clarity and ease of reference.

[4] 1985 Trial Transcript at 644 (Bates 1083).

[5] *Id*. at 666-67 (Bates 1106-07).

[6] *Id*. at 834 (Bates 1278).

[7] *Id*.  At trial, Dr. Sharon Schnittker, the medical examiner who performed the autopsy of Mrs. Oleson, testified that Mrs. Oleson was still alive when she was shot, even though the stab wounds, which fractured three of her ribs, pierced her heart, and perforated her lung, ultimately would have been fatal.  *Id*. at 837-38 (Bates 1281-82).

[8] *Id*. at 636 (Bates 1075).

Petitioner surfaced as a suspect in Mrs. Oleson's murder in mid-March 1985 and, at that time, was one of eight suspects in the homicide.[9]  In early April 1985, he became the primary suspect when Anne Carter, then Petitioner's wife, provided the Utah County Attorney's Office with information about her husband's possible involvement with the Oleson murder.[10]  Based on Ms. Carter's statements,[11] on April 11, 1985 the police issued a warrant for Petitioner's arrest for the murder of Eva Oleson.[12]  The police also identified and questioned Epifanio and Lucia Tovar as witnesses.[13]

On June 11, 1985, Petitioner was arrested in Nashville, Tennessee at the home of a friend, JoAnne Robins.[14]  He was booked into the Metropolitan Nashville jail where he was questioned

---

[9]*Carter II*, 888 P.2d at 634.

[10]*Id*.  At trial there was evidence that Petitioner's wife had purchased a .38 caliber handgun based on Petitioner's recommendation.  Trial evidence showed that the type of bullet found in Mrs. Oleson's skull could have been fired from a .38 caliber firearm (though it could have also been fired from a .357).  Trial evidence also showed that .38 ammunition, similar to the bullet found in Mrs. Oleson's skull, was found during a search of the apartment Petitioner shared with his wife.  *See* 1985 Trial Transcript at 865-83 (Bates 1309-27).  Police never found the gun that was used to commit the murder.

[11]Docket No. 493, Ex. 6.

[12]*Carter II*, 888 P.2d at 635.

[13]*Id*; *see also* Docket No. 417, Exs. 4 & 5.

[14]Ms. Robins was also arrested and charged with harboring a fugitive.  *See* 1985 Suppression and Venue Change Hearing Transcript at 41-42 (Bates 280-81) (hereinafter 1985 Suppression Hearing Transcript).  Petitioner testified that he saw her across the hall when she was arrested.  *Id*. at 76 (Bates 315).  Sergeant Cunningham confirmed that Petitioner may have seen her in the booking or holding area.  "You know, we have no control of that."  *Id*. at 46 (Bates 285).  Ms. Robins was released "with time served" the day after Petitioner signed his confession.  *See* 1985 Trial Transcript at 806-07 (Bates 1250-51).

numerous times over two days by Nashville police officer Sergeant Cunningham about the Oleson murder.[15]  During that time, Petitioner expressed repeated concern for Ms. Robins but did not confess to Mrs. Oleson's murder.[16]

On June 12, 1985, Lieutenant George Pierpont from the Provo City Police Department, arrived in Nashville to extradite Petitioner back to Utah.[17]  One hour after meeting Petitioner, Pierpont had what the Nashville police had failed to procure: a typed confession for Petitioner to sign.[18]  Petitioner did so.[19]

---

[15] 1985 Suppression Hearing Transcript at 10-52 (Bates 249-91); *see also* 1985 Trial Transcript at 785-93 (Bates 1225-33).

[16] 1985 Suppression Hearing Transcript at 18 (Bates 257) and 41-42 (Bates 280-81). Petitioner testified at the 1985 Suppression Hearing that he was told by Sergeant Cunningham of the Nashville Police Department and Lieutenant Pierpont of the Provo Police Department that if he confessed to the Oleson crime they would "help" Ms. Robins.  *Id*. at 75-76 (Bates 314-15), 78 (Bates 317), and 80-81 (Bates 319-20).  Petitioner also testified that Sergeant Cunningham made "promises" and told him that Ms. Robins' children would be removed from her and placed into foster care unless he confessed.  *Id*. at 74 (Bates 313) and 79 (Bates 318).  Both officers denied making such statements.  *See id*. at 43-49 (Bates 282-88) and 55-56 (Bates 294-95); *see also* 1985 Trial Transcript 748-49 (Bates 1188-89), and 789-90 (Bates 1229-30).

[17] 1985 Suppression Hearing Transcript at 53 (Bates 292).

[18] *Id*. at 66 (Bates 305).  Lieutenant Pierpont testified that after meeting with Petitioner for 30 minutes, he dictated a statement and a secretary then typed it for Petitioner to sign.  *Id*. at 66-69 (Bates 305-308); *see also* 1985 Trial Transcript at 745-50 (Bates 1185-90) and 770-72 (Bates 1210-12).  In 1990, when Petitioner filed a discovery request for the original tape recording of Lieutenant Pierpont's dictated statement, the state responded that the tape had been destroyed and "all evidence in any way relevant to the case and known to the State was included in police reports long ago made available to Carter."  *See Carter II*, 888 P.2d at 636-37.

[19] Docket No. 493, Ex. 1.  At the Suppression Hearing, Petitioner testified that while his signature was at the bottom of the confession, it was not the document he signed.  *See* 1985 Suppression Hearing at 91-92 (Bates 330-31).

I went to the home of Eva Oleson . . . and knocked on the door.  She answered the door at which time the phone rang and she went to answer it.  I then walked into the home and as she came back I pointed my gun at her and demanded money from her.  She gave me approximately $20.00 which was in several different types of bills.  She then tried to get away from me by going to the back door of the home and I stopped her.  She then picked up a butcher knife which was located on the counter and I pointed my gun at her and told her to drop it, which she did.  I then told her to go into a back television room, which she did and I ordered her down on the floor and tied her hands behind.  I then proceeded to stab her, multiple times and she did not appear to die and was moaning.  I then went around the house looking for items to steal.  Could not find any so I went back and then I ended up shooting her in the back of the head.  I attempted to muffle the sound of the gun shot by placing a pillow over the top of the gun and the hammer to the gun hit the pillow not allowing it to fire.  I then attempted to fire it again, this time the bullet entering the back of Mrs. Oleson's head.  I then left the house, went to my mother's and eventially [sic] went back to Epifineio [sic] Tovar's home and told him and his wife what I had done.[20]

Petitioner's confession was corroborated at trial by testimony from the Tovars, who were the state's "key witnesses."[21]  Mr. Tovar testified through an interpreter that the night of the murder Petitioner, a good friend of several years, left their house saying he was going to "rape,

---

[20]Docket No. 493, Ex. 1.

[21]*Carter II*, 888 P.2d at 645.  In Utah, "[t]he corpus delicti rule states that a person may not be convicted of a crime if no independent evidence, outside of the defendant's own statement, exists.  To satisfy the doctrine, the State must establish by clear and convincing evidence that the injury or harm specified in the crime occurred and that the injury or harm was caused by someone's criminal activity."  *State v. Archuleta*, 850 P.2d 1232, 1241 n.24 (Utah 1993).  Accordingly, "the State relied heavily on the Tovars' incriminating testimony at trial." *Carter II*, 888 P.2d at 635.  Although not eye-witness testimony, Mr. Tovar's testimony was the only evidence that placed Petitioner at the Oleson home the night of the murder; his testimony also provided evidence that Petitioner committed the homicide, something forensic evidence failed to do.  *See id*. at 645 & n.18.  Mrs. Tovar's testimony corroborated some of her husband's testimony.  In his closing argument, the prosecutor commented on Mrs. Tovar's testimony, stating: "You know, Lucia Tovar to me was one of the most impressive witnesses in this particular case.  She told you in all honesty everything that she saw."  1985 Trial Transcript at 909 (Bates 1353).  This statement is discussed below in Claim V.

5

break and drive,"[22] and that when Petitioner returned later that night, he told him that he had killed a woman by stabbing her repeatedly and then shooting her in the head.[23]  Mr. Tovar also testified that some time after the murder, Petitioner brought a .38 caliber firearm to his house, hidden inside of a portable Whirlpool bathtub, and that he later disposed of the gun at Petitioner's request.[24]

Mrs. Tovar testified through an interpreter that Petitioner came to their house the night of the murder to talk with her husband, and that she saw Petitioner show her husband "something he had done."[25]  Mrs. Tovar testified that Petitioner "laughed and laughed" while talking to her husband.[26]  Mrs. Tovar also testified that she heard her husband tell Petitioner he was crazy, and that in response Petitioner told her husband to watch the news and stated: "I swear by my mother that it is true."[27]

---

[22]*Id*. at 689 (Bates 1129).

[23]*Id*. at 689-99 (Bates 1129-39).  "He told me that he had, after he had stabbed the woman, he took the gun and he took a nearby pillow, he put the pillow over the gun to muffle the sound.  As he fired the gun to the head it misfired.  He pulled the gun, it misfired because the trigger apparently got caught in the pillow, he took the pillow away, took the gun back to the woman's head and fired it and killed her."  *Id*. at 696-97 (Bates 1136-37).

[24]*Id*. at 702-08 (Bates 1142-48).  Mr. Tovar did not provide information about the gun to the police until the Saturday before the trial started.  *Id*. at 722 (Bates 1162).  He testified that he had lied about his knowledge of the gun during previous discussions with the police.  *Id*. at 723 (Bates 1163).

[25]*Id*. at 814 (Bates 1258).

[26]*Id*.

[27]*Id*. at 815 (Bates 1259).

Mr. Tovar, who was 20 years old when he was a witness at Petitioner's trial,[28] also testified that he had a three-year old son,[29] an eighth grade education,[30] and smoked marijuana "[w]henever I get my hands on it."[31]  He testified that he was not a citizen, did not have a green card,[32] and that Lieutenant Pierpont had put him in jail for four days in April 1985 to interview him about the Oleson murder.[33]   In response to the question about whether he or his family had received "money or support" from the prosecutor's office or the police, Mr. Tovar denied that he had received "any kind of aid" and stated that he had only received a fourteen dollar check from

---

[28]*Id*. at 716 (Bates 1158).

[29]*Id*. at 691 (Bates 1131).

[30]*Id*. at 717 (Bates 1157).

[31]*Id*. at 725 (Bates 1165).

[32]*Id*. at 724 (Bates 1164).

[33]*Id*. at 728-29 (Bates 1168-69).  He testified he was held for "destructive justice," which was "obstructing justice."  Docket No. 417, Ex. 4.

the city, and that his wife received one too.[34]  The prosecutor did not object to or correct this testimony.

## II.  PROCEDURAL HISTORY

A.      1985 TRIAL

At his 1985 trial, Petitioner was represented by E. Duke McNeil, a Chicago civil rights attorney hired by Petitioner's family to represent him.[35]  Prior to trial, Mr. McNeil filed notice of an insanity defense or, in the alternative, a defense of diminished capacity.  These defenses were

---

[34]1985 Trial Transcript at 724 (Bates 1164).  Petitioner challenges this statement, the Tovars' credibility, and the corroborative weight of their testimony based on newly-discovered, and previously unavailable, evidence that the Tovars received much more from the Provo City Police Department than their combined $28 in checks.  *See* Docket Nos. 414, 446 and 448.  As discussed below in terms of Claims X and XLII, the Tovars did not testify at Petitioner's 1992 Penalty Phase Hearing.  The state argued they were missing despite efforts to locate them and that they had fled the country.  Apparently they had.  Through coincidence, Petitioner's counsel located the Tovars in a part of Mexico rendered mostly inaccessible because of the danger posed by drug cartels, and obtained declarations from them with the help of a special investigator.  *See* Docket No. 448, at 12-13.  The Tovars' new declarations state that between April and December 1985, Provo Police officers gave them monthly cash infusions of roughly $400 for their rent, moved them into two new apartments, paid their utility bills, and delivered groceries, toys, and a Christmas tree.  *See* Docket No. 446, Exs. 1-4.  Significantly, the Tovars' declarations are corroborated by new declarations from former members of the Provo City Police Department who were involved in the Oleson case.  *See* Docket No. 446, Exs. 5-7.  Petitioner is litigating *Brady/Napue* claims based on these new declarations in The Fourth Judicial District Court for Utah County, Case No. 060400204.  These new declarations may not be considered by this Court.  Petitioner's Second Amended Petition for Writ of Habeas Corpus was not amended or supplemented to add these claims for a variety of procedural reasons.  Therefore, the newly-discovered evidence is extra-record evidence pursuant to 28 U.S.C. § 2254 and *Cullen v. Pinholster*, 131 S.Ct. 1388 (2011).

[35]Gary Weight and Michael Esplin were also listed as attorneys of record during the 1985 trial, but their role was to help McNeil comply with the local rules requiring out-of-state lawyers to associate with local counsel.

later withdrawn.  In addition, Mr. McNeil filed motions seeking to suppress Petitioner's

confession[36] and to change venue.[37]

　　　　The trial court held a hearing on both motions on December 9, 1985.  As later detailed by

the Utah Supreme Court, the trial court was presented with conflicting evidence about whether

Petitioner's statement was coerced:

> 　　　　At the hearing on defendant's motion to suppress, a Nashville police
> officer testified that he gave defendant a *Miranda* warning after arresting him.  At
> the police station later that day, he again advised defendant of his *Miranda* rights
> and obtained a written waiver of those rights from him.  The officer then
> questioned defendant for several hours over the next two days; during those times,
> defendant was allowed to smoke, drink water, and use restroom facilities.
>
> 　　　　The officer testified that he did not threaten defendant.  He also denied that
> he used the friend's [JoAnne Robins] situation or that of her children in any
> manner to intimidate defendant into confessing, stating that he offered
> information about her status only in response to defendant's frequent questions
> regarding her.
>
> 　　　　A police officer from the Provo police department was sent to Tennessee
> to extradite defendant.  At the suppression hearing, the Provo officer testified that
> when he interviewed defendant in Tennessee, he advised defendant of his
> *Miranda* rights and soon obtained a confession from him.  Thereafter, the officer
> apparently dictated the confession, stopping after every few lines to ask defendant
> whether what was dictated was accurate.  The confession was then reduced to
> writing and signed.  Although acknowledging at the suppression hearing that he
> had interviewed defendant's friend prior to questioning defendant, the officer
> denied making any threats or promises to defendant concerning her.
>
> 　　　　In contrast, defendant testified that he never received *Miranda* warnings
> from the Nashville or the Provo officer and that he could not recall signing written

---

　　　　[36]Docket No. 173, Ex. 31.  The Motion to Suppress is discussed in more detail in relation
to Claim III.

　　　　[37]*Id*., Ex. 32.

9

waivers of his constitutional rights.  Defendant did acknowledge, however, that his signature appeared to be on documents waiving those rights.[38]

During the hearing on the motion for change of venue, Mr. McNeil called Swen Nielsen, then the Chief of Police in Provo, and the nephew of Mrs. Oleson.  Mr. McNeil elicited testimony from Chief Nielsen that Mrs. Oleson was his aunt,[39] that he had known her for more than 40 years,[40] that he had been interviewed by, and made statements to, the media—radio, print, and television—about his aunt's murder,[41] and that the coverage reached all of Provo, Utah and beyond.[42]

The trial court denied both motions, finding Petitioner's confession was voluntary, and that the circumstances did not show that Petitioner could not receive a fair trial in Provo, Utah.

Petitioner's trial started in Provo's Fourth Judicial District on December 12, 1985, with the guilt phase commencing on December 17, 1985.  On December 18, 1985, the jury unanimously found Petitioner guilty of first degree murder.

With a special verdict, the jurors also found that two aggravating circumstances existed beyond a reasonable doubt: (1) that Petitioner murdered Mrs. Oleson while committing, or attempting to commit, aggravated burglary; and (2) that the murder was committed in an

---

[38]*Carter I*, 776 P.2d at 889-90; *see also* 1985 Suppression Hearing Transcript at 65-70 (Bates 304-09), 75 (Bates 314), 84-85 (Bates 323-24), and 93-94 (Bates 332-33).

[39]*Id*. at 128-29 (Bates 367-68).

[40]*Id*. at 129 (Bates 368).

[41]*Id.* at 129-32 (Bates 368-71).

[42]*Id.* at 131 (Bates 370).

exceptionally heinous, atrocious, cruel, or exceptionally depraved manner.  Under Utah law, those two aggravating circumstances made Petitioner eligible for the death penalty.

On December 19, 1985, the jury sentenced Petitioner to death.[43]

B.    *CARTER I*

Petitioner sought direct appeal with the Utah Supreme Court.  He was represented by Gary Weight, the lawyer who served as local counsel during Petitioner's trial.  The Utah Supreme Court affirmed Petitioner's conviction and dismissed most of his claims, but remanded the case for re-sentencing because of erroneous jury instructions regarding an aggravating circumstances.

Although Petitioner raised a number of issues on direct appeal, the Court limits its summary to those issues that are relevant to the remaining claims before the Court.

On appeal, Petitioner claimed "that the trial court erred by not suppressing his confession."[44]  The Utah Supreme Court found, however, that the totality of the evidence showed the confession was made voluntarily, without any significant omission, and was corroborated by testimony from the Tovars.[45]  The court held: "The trial court was presented with significantly different accounts of the circumstances of defendant's confession.  However, defendant has not

---

[43]*Carter II*, 888 P.2d at 636.

[44]*Carter I*, 776 P.2d at 889.

[45]*Id*. at 890.

shown that the court abused its discretion in assessing the evidence presented and drawing a

reasonable conclusion therefrom."[46]

The Utah Supreme Court also rejected Petitioner's challenges to the way the confession

was obtained, finding that the admission of the confession was not prejudicial error.[47]

Nevertheless the court noted that it did "not sanction the particular manner in which [the

confession] was recorded in this case."[48]

The Utah Supreme Court next addressed Petitioner's "claim that the prosecutor indirectly

commented on defendant's failure to testify at trial and suggested to the jury that his silence

implied guilt."[49]  Specifically, Petitioner took issue with the following statement the prosecutor

made during closing arguments:

> I heard no evidence, evidence, [sic] from the witness stand about coercion or
> about inducing somebody to say anything about something that didn't happen.  I
> heard no evidence that supports any other theory in this case than the theory that
> was presented by the State of Utah, that he's guilty of first degree murder.[50]

Upon review, the court noted that "a prosecutor's direct reference to a defendant's

decision not to testify is always a violation of that defendant's fifth amendment right against self-

---

[46]*Id.*

[47]*Id.* at 891.

[48]*Id.*

[49]*Id.*

[50]*Id.*

incrimination."[51]  However, the court held that indirect references are permissible under certain circumstances.

The court found that the statement was "clearly not a direct reference" and further stated that the court did not believe "that the statement in question would naturally and necessarily be construed by the jury as a comment on defendant's silence."[52]  Further, the court found that "the passage quoted could refer to the lack of any evidence elicited from witnesses or from officers present during defendant's confession contradicting the State's theory of the case."[53]  Finally, the court found that the statement was isolated and any prejudice was cured by the trial court's instructions.[54]  Therefore, the court found this claim to be "without merit."[55]

The Utah Supreme Court considered Petitioner's claims that he was denied effective assistance of counsel under the standard set out in *Strickland v. Washington*[56]: "In order to prevail on such a claim, a defendant must show, first, that his or her counsel rendered a deficient performance in some demonstrable manner, which performance fell below an objective standard

---

[51]*Id.*

[52]*Id.*

[53]*Id.*

[54]*Id.*

[55]*Id.*

[56]466 U.S. 668 (1984).

13

of reasonable professional judgment, and, second, that counsel's performance prejudiced the defendant."[57]

In ruling on Petitioner's ineffective assistance of counsel claims, the court stated:

After reviewing defendant's asserted claims of error in this regard, we conclude that most of his allegations of prejudice are wholly speculative and in no way give rise to the conclusion that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Additionally, defendant has not sufficiently shown how the decisions made by trial counsel were not merely tactical choices or how counsel's performance fell below an objective standard of reasonable professional judgment. Other claims are clearly not supported by the record. . . . Accordingly, defendant's claims of ineffective assistance of counsel are, for the most part, without merit.[58]

Despite this, the Utah Supreme Court found "that manifest error was committed during the penalty phase."[59] The court found that the jury was improperly instructed on an aggravating factor, specifically the heinous, atrocious and cruel aggravating factor in Utah Code Ann. § 76-5-202(1)(q) discussed in Claim XXIII. The court found that "the improper instructions denied this jury the opportunity to properly determine whether the mitigating factors were 'sufficiently strong when compared with the aggravating factors to create a substantial and reasonable doubt that the death penalty is appropriate.'"[60] As a result, the court remanded for new sentencing proceedings.[61]

---

[57]*Carter I*, 776 P.2d at 893.

[58]*Id*. at 893-94 (quoting *Strickland*, 466 U.S. at 694).

[59]*Id*. at 894.

[60]*Id*. at 895-96 (quoting *Andrews v. Morris*, 677 P.2d 81, 84 (Utah 1983)).

[61]*Id*. at 896.

In a concluding paragraph, the court stated: "We have reviewed defendant's other claims raised on appeal and find them to be without merit."[62]

C.     1992 PENALTY PHASE HEARING

Petitioner was represented by Craig Snyder and John Musselman for the re-sentencing hearing.  In its analysis of the appeal ultimately taken from the hearing, the Utah Supreme Court in *Carter II*, provides a useful summary of the events prior to the hearing.

In preparation for the second penalty hearing, on March 23, 1990, the State filed its proposed method of presentation of the case, in which the State proposed to call witnesses who testified at the previous trial and sentencing phase.  Pursuant to Utah Code Ann. § 76-3-207(4), the State also sought to introduce all the exhibits from the original trial, along with a transcript of all properly admitted testimony.  This "Abstract from Transcript of Trial" (the "Abstract") contained all testimony introduced by either party at the original guilt and sentencing proceedings.  However, the State had "cleaned up" the transcript by deleting counsels' arguments, motions, and objections.  The State intended that the Abstract be admitted as an exhibit for the jury to take into the jury room.  In addition, the State declared its intent to read excerpts from the Abstract—in particular, portions of the Tovars' testimony—directly to the jury.

On October 4, 1990, Carter filed a motion and memorandum opposing the State's proposed method of presenting its case.  On January 30, 1991, the trial court denied Carter's motion to exclude the transcribed prior testimony.  Carter then filed an interlocutory appeal, asking [the Utah Supreme Court] to review the trial court's decision.  On April 11, 1991, [the Utah Supreme Court] denied Carter's interlocutory appeal.  On January 16, 1992, the trial court denied Carter's motion to prevent the Abstract from being admitted as an exhibit.

On September 28, 1990, Carter filed a discovery request seeking, inter alia, the original tape recording of his confession and all evidence known to the State that tended to mitigate his guilt.  The State responded that it could not produce the original tape recording, as it had been destroyed.  As for any possible exculpatory evidence, the State replied that all evidence in any way relevant to the

---

[62]*Id.*

case and known to the State was included in police reports long ago made
available to Carter.

On October 4, 1990, Carter filed a motion in limine to prohibit the
introduction into evidence of any reference to the aggravating facts contained in
Utah Code Ann. § 76-5-202(1)(q).  The trial court denied Carter's motion on
January 30, 1991.  On January 16, 1992, Carter again unsuccessfully moved to
prevent the instruction of the jury on the heinous nature of the crime as an
aggravating circumstance.

On January 16, 1992, about one week before the penalty hearing, the trial
court heard several motions, including Carter's motion for a new trial and motion
in limine to exclude evidence or alternatively to suppress. . . . The trial court
denied both motions on January 17, 1992.
. . . .

At the 1992 penalty hearing, the State introduced the Abstract, which
contained the statements of all witnesses who testified at the 1985 guilt and
sentencing proceedings.  Carter again unsuccessfully objected to the State's plan
to read selected excerpts from the document and also to its entry into evidence as
an exhibit.  Accordingly, the State read from the transcript and entered it into
evidence.
. . . .

The jurors took the exhibits, including the Abstract, into the jury room.
After deliberating for approximately six hours, on January 23, 1992, the jury
unanimously rendered a verdict of death.[63]

In addition to the above, at the 1992 Penalty Phase Hearing the State provided the live

testimony of the medical examiner, the officer responsible for photographing the crime scene,

and Lieutenant Pierpont.  Their testimony largely mirrored what they said at the 1985 trial.

Unlike the trial, where McNeil put forth no witnesses, at the Penalty Phase Hearing

Petitioner offered the testimony of his family (their testimony is discussed in Claim VIII), and of

---

[63]*Carter II*, 888 P.2d at 636-37.  The documents mentioned in this portion of *Carter II*
have been provided to the Court by Petitioner.  *See* Docket No. 501.

a forensic and clinical psychologist, Dr. Howell (his testimony is discussed in Claims VIII and XI).

Petitioner also testified at the 1992 Penalty Phase Hearing.  Petitioner apologized to the Oleson family and to his own family, then asked the jury to spare his life.[64]

The Penalty Phase jury unanimously rendered a verdict of death.

D.    *CARTER II*

Petitioner appealed his second sentence of death to the Utah Supreme Court.  In that appeal Petitioner was represented again by Craig Snyder (who had represented Petitioner at the rehearing) and Linda Barclay.  Petitioner's claims on his appeal to the Utah Supreme Court were:

> [T]wo claims of error with respect to his underlying conviction: (1) the denial of his January 1992 motion for a new trial and motion in limine to exclude evidence or alternatively to suppress, and (2) the refusal to suppress his confession made to law enforcement officials in Nashville, Tennessee.
>
> With respect to the 1992 penalty hearing, Carter makes the following arguments and claims of error: (1) Utah Code Ann. § 76-3-207(4) is unconstitutional on its face and as applied to this case, under both the United States and Utah Constitutions; (2) the trial court committed reversible error in allowing the jury to consider the allegedly heinous nature of the crime as an aggravating circumstance in determining his sentence; (3) the trial court erred by refusing to excuse for cause potential jurors who exhibited substantial bias and/or physical incapacity; (4) the trial court erred by admitting victim impact evidence; (5) the trial court erred by admitting evidence of the alleged rape of the victim; (6) the jury did not unanimously and specifically find, beyond a reasonable doubt, each aggravating factor relied on in imposing its sentence; and (7) the Utah capital sentencing scheme violates the United States and Utah Constitutions.[65]

---

[64]1992 Penalty Phase Hearing Transcript at 1261-62.  The version of the 1992 Penalty Phase Hearing Transcript provided to the Court at Docket No. 501 contains no Bates stamp numbers.

[65]*Carter II*, 888 P.2d at 633.

The Utah Supreme Court found these claims to be without merit and affirmed Petitioner's conviction and death sentence.

E.      STATE POST CONVICTION PROCEEDING

Petitioner first filed a pro se application for writ of habeas corpus and post-conviction relief in the Fourth Judicial District in Provo, Utah in October 1995.   In December 1995, four lawyers—Bradley Rich, Jack Morgan, Jeffrey Hunt, and Christian Rowley—assumed representation of Petitioner.  Petitioner's new legal team filed an amended petition in February 1996.  A second amended petition was filed in July 1998.

The state trial court dismissed the petition.[66]  The state district court dismissed some of Petitioner's claims for purely procedural reasons—either because they had been raised on direct appeal or because they could have or should have been raised on direct appeal.  The court dismissed other claims after reviewing them on the merits.

As the district court's decision was appealed to the Utah Supreme Court, the analysis of the particular claims raised in the state habeas petition, and how the district court addressed them, are best discussed in that context.

F.      *CARTER III*[67]

Petitioner was represented by Bradley Rich and Jack Morgan when he appealed the district court's dismissal of his state petition for post-conviction relief to the Utah Supreme Court.  Like the district court below it, the Utah Supreme Court first held that a number of claims

_____

[66]Docket No. 111, Addendum O, Appellant's Addenda VI.

[67]*Carter v. Galetka*, 44 P.3d 626 (Utah 2001) (hereinafter *Carter III*).

were procedurally barred, either because they were "raised and disposed of on direct appeal" or

"could and should have been raised on direct appeal."[68]  Specifically, the court held that the

following claims were procedurally barred because they were raised on direct appeal in *Carter I*

or *Carter II*:

> (1) Counsel during the 1985 trial was ineffective for (a) failing to seek any pretrial
> discovery from the State, (b) failing to conduct any investigation into the crime,
> and (c) failing to request appointment of a psychiatric expert to assist in Carter's
> defense.  (2) The trial court during the 1992 penalty hearing failed to remove for
> cause biased and incompetent members of the venire panel.  (3) The trial court
> during the 1992 penalty hearing admitted into evidence the abstract of testimony
> from the first trial, which denied Carter's right to confront and cross examine the
> witnesses against him.  (4) The trial court erred in denying Carter's motion for a
> change of venue.  (5) The trial court refused to suppress Carter's statements to
> police, despite the fact that police officers allegedly used questionable means to
> obtain the statements.  (6) The prosecution in Carter's 1985 trial engaged in
> misconduct by (a) improperly commenting on Carter's right to remain silent, (b)
> improperly vouching for a witness during his closing argument, (c) improperly
> interfering with the attorney-client relationship between Carter's wife and her
> attorney, and (d) improperly, and without authorization, granting immunity to
> Carter's wife.  (7) The trial court during the 1992 penalty hearing improperly
> admitted prejudicial victim impact evidence.  (8) The trial court failed to instruct
> the jury that they must vote unanimously as to the aggravating circumstance.  (9)
> Carter was denied a fair sentencing determination because the guilt phase and first
> penalty hearing were not bifurcated.  (10) The trial court during the 1992 penalty
> hearing submitted an aggravating circumstance to the jury that was not supported
> by sufficient evidence.  (11) The Utah Supreme Court improperly applied the
> harmless error analysis to the admission of the victim impact evidence at the 1992
> sentencing hearing.  (12) The Utah Supreme Court acknowledged errors in the
> 1992 penalty hearing, yet the court refused to find that Carter was prejudiced
> based on the cumulative effect of the errors.  (13) Carter was subjected to double
> jeopardy because evidence was admitted during the penalty phase regarding the
> rape or attempted rape charges, after the jury, during the guilt phase, found Carter
> not guilty of those charges.  (14) Carter was denied adequate appellate review
> because the jury was not required to submit a special verdict form finding each
> aggravating circumstance beyond a reasonable doubt.  (15) There is an

---

[68]*Id*. at 630.

unconstitutional conflict between two subsections of 76-3-207 of the Utah Code.
(16) The trial court prejudicially instructed the jury on crimes that had not been
charged in the Information.[69]

The Utah Supreme Court found that the following claims were procedurally barred

because they were raised in an amicus curiae brief in *Carter I*:

> (1) Trial counsel was ineffective for (a) not investigating the circumstances under
> which Carter confessed to the crime, (b) not being familiar with Utah law, (c) not
> presenting evidence to support Carter's motion for a change of venue, (d) failing
> to cross-examine the State's medical expert, (e) presenting no defense on Carter's
> behalf, and (f) failing to object to the jury instructions.[70]

Finally, the court held that the following claims were procedurally barred and not eligible

for consideration because they could and should have been raised on direct appeal, and because

Petitioner had not shown unusual circumstances[71] as to why they were not:

> (1) Out-of-state trial counsel was ineffective for (a) failing to adequately consult
> with Carter before the trial, (b) being the subject of numerous bar complaints, (c)
> failing to timely object to a witness's testimony that was given half in English and
> half in Spanish, (d) failing to preserve for appeal his attempt to cross examine the
> victim's husband, (e) failing to investigate the crime to discover evidence that
> may have assisted Carter's defense, (f) not probing the prosecution witnesses as to
> why no forensic evidence was introduced, (g) stating in his closing argument that
> if "we" sentence Carter to death "we sink to his level," (h) not preparing questions
> to ask the jury during voir dire, and (i) failing to argue that the Information
> charging Carter with capital homicide was defective. (2) Local trial counsel was
> ineffective for failing to assist Carter's attorney from Illinois in any meaningful
> way. (3) The trial court in the second penalty hearing erroneously passed for
> cause a juror who demonstrated bias. (4) The prosecution withheld evidence that
> was favorable to Carter. (5) The jury instructions during the original trial and the
> 1992 penalty hearing failed to properly convey the concept of reasonable doubt to
> the jury. (6) The trial court in the second penalty hearing failed to answer a

---

[69]*Id*. at 630-31.

[70]*Id*. at 631.

[71]*Id*. at 633.

question from the jury regarding the appropriateness of the death penalty. (7) The trial court denied Carter the right to confront a witness by allowing the witness to begin his testimony in English and then switch to Spanish and use an interpreter during a crucial part of his testimony. (8) The prosecutor during the original trial engaged in misconduct by (a) withholding evidence favorable to the defense, (b) mischaracterizing the reasonable doubt standard, and (c) instructing the jury that it need not look at the not guilty option on the verdict form. (9) The prosecutor during the 1992 penalty hearing engaged in misconduct by (a) commenting on the impact alcohol use would have had on Carter, and (b) turning the use of alcohol into an aggravating factor instead of a mitigating one. (10) The death penalty statute unconstitutionally shifts the burden of proof to a defendant to prove his/her life should be spared. (11) The trial court's jury instructions in the 1992 penalty hearing improperly limited the jury's consideration of mitigating factors. (12) The trial court in the 1992 penalty hearing improperly instructed the jury that it could not reconsider the presence or absence of the aggravating circumstance of aggravated burglary. (13) The trial court in the 1992 penalty hearing failed to adequately instruct the jury on the definition and use of mitigating circumstances. (14) The aggravating circumstance in section 76-5-202(1)(q), that the homicide was committed in an especially heinous, atrocious, cruel or exceptionally depraved manner, is unconstitutionally vague and overbroad. (15) The death penalty scheme is unconstitutional because it permits the jury to consider any fact in aggravation of the crime. (16) The death penalty scheme is unconstitutional because it creates a presumption that death is the appropriate penalty. (17) The death penalty scheme unconstitutionally allows the introduction of any evidence deemed to have probative value. (18) The trial court in the 1992 penalty hearing failed to bifurcate the guilt phase proceedings. (19) The prosecution failed to provide Carter with sufficient notice of the charges against him. (20) Carter was denied due process because the trial court did not conduct all of the proceedings on the record. (21) The trial court during the 1992 penalty hearing violated Carter's equal protection rights because it did not inform the jury that the death penalty is the "exception" rather than the "rule." (22) The trial court during the second penalty hearing precluded members of the community who were prone to imposing a life sentence thereby creating a "death qualified jury." (23) The death penalty scheme is unconstitutional because it fails to narrow the class of persons eligible to receive the death penalty. (24) The trial court in the 1992 sentencing hearing failed to give an instruction regarding the possibility of parole. (25) The jury instructions during the 1992 penalty hearing presented an unacceptable risk that the jury would not fully consider the mitigating circumstances. (26) Carter

was denied the right to trial by an impartial jury of his peers. (27) The trial court failed to instruct the jury on the required elements of aggravated burglary.[72]

The Utah Supreme Court next turned to those claims that the district court reviewed on the merits. This Court addresses those claims that are relevant to the merits of Petitioner's remaining claims before it.

The Utah Supreme Court addressed Petitioner's contention that Dr. Howell labored under "an insurmountable conflict of interest" based on his preparation of a psychological profile of the unidentified perpetrator in 1985 (discussed below in Claim XI).[73] The district court rejected this claim, finding that any error was harmless. The Utah Supreme Court agreed, holding that "[a]lthough Dr. Howell should have disclosed his prior involvement with the case, Carter has demonstrated no prejudice that resulted from his failure to do so."[74]

The court then discussed a number of ineffective assistance of counsel claims that were decided on the merits by the district court judge:

(1) Trial counsel in the 1992 penalty hearing was ineffective for (a) failing to adequately investigate available mitigating evidence, (b) failing to hire a mitigation expert to investigate Carter's background to present to the jury, (c) failing to object to the trial court's failure to give part of the instructions contained in section 76-3-207(2) of the Utah Code, thus omitting the statutory mitigators related to duress or the involvement of other persons, and (d) passing a juror, Nelson, for cause after the juror stated that he subscribed to the doctrine of blood atonement and he believed in the mark of Cain. (2) Appellate counsel in *Carter I* was ineffective for (a) failing to argue that the jury instruction addressing reasonable doubt was improper, (b) failing to raise the fact that the prosecution withheld material evidence from Carter, (c) failing to argue that Carter had been

---

[72]*Id*. at 632-33.

[73]*Id*. at 634.

[74]*Id*. at 635.

denied a psychiatric expert, (d) failing to assure the existence of a complete record, (e) failing to argue that the Information charging Carter was defective, and (f) failing to argue that trial counsel was ineffective.  (3) Appellate counsel in *Carter II* was ineffective for (a) failing to move for a Rule 23B remand hearing to establish facts relating to a claim for ineffective assistance of trial counsel, and (b) failing to raise the issues Carter now raises in his petition for habeas corpus.[75]

With regard to Petitioner's claims that trial counsel in the 1992 penalty hearing was ineffective for failing to adequately investigate available mitigating evidence and failing to hire a mitigation expert to investigate Carter's background to present to the jury, the court found that Petitioner "failed to demonstrate that counsel's performance, relating to the mitigation evidence provided, was deficient and fell below an objective standard of reasonable professional judgment."[76]  The court noted that "counsel presented evidence of Carter's troubled childhood, his failed marriage, a head injury that may have caused brain dysfunction rendering him more prone to violence, particularly when under the influence of alcohol, and the love Carter and his family share with one another."[77]  Further, Petitioner "had not shown what additional evidence was available to present to the jury."[78]

Finally, with regard to the ineffectiveness claim against trial counsel in the 1992 Penalty Phase Hearing, the court considered Petitioner's claim that counsel was ineffective for passing Juror Nelson for cause.  The court held that Petitioner failed to satisfy either prong of the

---

[75]*Id*. at 636-37.

[76]*Id*. at 637.

[77]*Id*.

[78]*Id*.

*Strickland* test.[79]  As to the first prong, the court noted that there were "no allegations that counsel was inattentive or indifferent to the jury selection process during the 1992 penalty hearing."[80]  Further, Petitioner had "not shown that Nelson's responses to voir dire demonstrated bias so strong or unequivocal that there was no plausible justification for counsel's decision not to challenge him for cause."[81]  Moreover, Petitioner had "not presented any evidence that there is some other specific evidence clearly demonstrating that counsel's choice was not plausibly justifiable."[82]  Turning to the second prong, the court held that Petitioner "failed to show that counsel's performance prejudiced him."[83]

Petitioner also argued that appellate counsel in *Carter I* was ineffective for failing to argue that trial counsel was ineffective.  The Utah Supreme Court rejected this argument "because appellate counsel in *Carter I* did in fact raise an ineffective assistance of trial counsel claim on appeal in *Carter I*."[84]

The court next addressed Petitioner's claims that appellate counsel in *Carter II* (who appealed the second death sentence) was ineffective for not arguing that the 1992 Penalty Phase

---

[79]*Id*. at 638-39.

[80]*Id*. at 639.

[81]*Id*.

[82]*Id*. (quotation marks and citation omitted).

[83]*Id*.

[84]*Id*. at 641.

counsel was ineffective at the hearing, and for failing to raise the claims that were raised in his first state petition for habeas corpus.

As to the first argument, the court noted that the same counsel represented Petitioner at the 1992 Penalty Phase Hearing *and* on appeal in *Carter II*. The court found that because of this, counsel was not ineffective for failing to raise his own ineffectiveness.[85]

Turning to the argument that counsel was ineffective for failing to raise the issues contained in his Petition, the Utah Supreme Court rejected this claim as follows:

> After reviewing all of the issues raised in Carter's petition for habeas corpus, we do not find any claims that warrant reversal of either his conviction or his death sentence. None of the issues raised warrants reversal, and appellate counsel in *Carter II* did not provide ineffective assistance in failing to raise these issues.[86]

G.      FEDERAL HABEAS PROCEEDING

Petitioner's federal habeas proceeding began in this Court in April 2002. Initially, Petitioner was represented by Jack Morgan and Mark Moffat.[87] As a preliminary matter, the parties disagreed about whether Utah met the opt-in provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which would have allowed for a streamlined federal habeas review. The Court tolled the limitations period imposed by 28 U.S.C. § 2263 until it resolved

---

[85]*Id*. at 642.

[86]*Id*.

[87]Leo Griffard was later substituted for Mr. Morgan. Docket No. 91.

this dispute.[88]  On June 10, 2003, the Court held that Utah had not met the opt-in requirements of AEDPA.[89]

The Court later clarified that its previous order also tolled the limitations period imposed by 28 U.S.C. § 2244(d)(1).[90]  Respondent sought amendment of this order to allow for interlocutory appeal under 28 U.S.C. § 1292(b).  This request was granted on January 3, 2004.[91] Respondent sought review from the Tenth Circuit, which was denied on March 31, 2004.[92]

Petitioner filed his Petition for Habeas Corpus Relief with this Court on March 25, 2004.[93]  In that Petition, Petitioner raised nearly fifty claims for relief, with various sub-claims.

Respondent moved to dismiss the Petition on August 31, 2004, on the following grounds: (1) the petition was time barred; (2) the petition failed to meet the requirements of 28 U.S.C. § 2254; (3) some claims did not present a federal question; (4) some claims were unexhausted; and (5) some claims were procedurally defaulted.[94]

---

[88]Docket No. 13.

[89]Docket No. 58.

[90]Docket No. 64.

[91]Docket No. 83.

[92]Docket No. 99.

[93]Docket No. 98.

[94]Docket No. 110.

The Court initially addressed grounds one and four.[95]  The Court denied Respondent's Motion on the issue of time bar, finding that the Petition was timely filed pursuant to the Court's previous orders and/or that equitable tolling was appropriate.  The Court, however, agreed with Respondent that a number of Petitioner's claims were unexhausted, which resulted in a mixed petition before the Court.  The Court requested supplemental briefing on whether a stay should be granted pursuant to *Rhines v. Weber*.[96]

After receiving supplemental briefing, the Court denied Petitioner's request for a *Rhines* stay on January 26, 2006.[97]  The Court gave Petitioner "the choice of refiling the federal habeas petition containing only his unexhausted claims, or having the Court dismiss the entire Petition without prejudice."[98]  Petitioner informed the Court, on February 24, 2006, that he intended to withdraw his unexhausted claims from his Petition.[99]  Shortly thereafter, Petitioner filed his Second Amended Petition.[100]

---

[95]Docket No. 136.

[96]544 U.S. 269 (2005).

[97]Docket No. 152.

[98]*Id*. at 16-17 (citing *Brown v. Shanks*, 185 F.3d 1122, 1124 (10th Cir. 1999)).

[99]Docket No. 153.  Specifically, Petitioner withdrew the following claims: I(A)(3), I(A)(5)(a), I(A)(5)(b), I(A)(5)(d), I(A)(5)(e), I(A)(5)(h) (partial), I(A)(5)(i), I(A)(5)(j), I(A)(5)(k), I(A)(5)(n), I(A)(6) (partial), I(A)(8), I(A)(10), I(A)(11), I(A)(12), I(A)(13), I(A)(14), I(A)(15), VI(A)(5), VI(A)(6), VI(A)(7), VI(A)(8), VI(A)(9), VI(A)(10), VII(A)(8), VIII(A)(5), VIII(A)(6), VIII(A)(7), VIII(A)(8), VIII(A)(9), VIII(A)(11), VIII(A)(12), VIII(A)(18), IX(A)(2), XIII(A)(6), XVI(A)(1)(g), XVII(A)(5), and XXXVIII(A)(3).

[100]Docket No. 154.

After the filing of his Second Amended Petition, the parties filed various motions concerning discovery. In addition, on October 11, 2006, Petitioner renewed his request for a *Rhines* stay.[101] The Court agreed to Petitioner's request and stayed this matter on August 2, 2007.[102]

On July 31, 2007, just before the Court granted the stay, the Utah Federal Public Defender's Office assumed representation of Petitioner because it had just received funding for a Capital Habeas Unit.[103] That representation was short-lived, however, because the Utah Federal Public Defender's Office had a conflict of interest. As a result, the Arizona Federal Public Defender's Office, Petitioner's current counsel, became Petitioner's lead counsel in mid-April 2009.[104]

Respondent moved to vacate the stay on February 15, 2008.[105] On June 11, 2008, the Victim's Representative, Gary Oleson, filed his demand for the rights contained in 18 U.S.C. § 3771.[106] After hearing from all parties, the Court granted Respondent's motion and re-opened

---

[101]Docket No. 191.

[102]Docket No. 201.

[103]Docket Nos. 198 and 199.

[104]Docket Nos. 232, 233, 248, 249, and 250.

[105]Docket No. 234.

[106]Docket No. 261.

this case.[107]  This action made ripe the remainder of Respondent's Motion to Dismiss, and the parties' discovery requests.

On July 20, 2010, the Court issued an order granting in part the remainder of Respondent's Motion to Dismiss.[108]  Specifically, the Court found that a number of Petitioner's claims were procedurally defaulted.[109]

Based on that ruling, the Court requested supplemental briefing as to any further discovery and factual development Petitioner sought.[110]  On August 23, 2010, Petitioner filed a supplemental brief outlining how he planned to develop facts relevant to his remaining claims.[111] In December 2010, the Court granted, over Respondent's objection, Petitioner's request for further factual development[112] and imposed a scheduling order to allow for factual development.[113]

The Supreme Court's decision in *Cullen v. Pinholster* on April 4, 2011, which limited federal habeas review of state court proceedings to the record before the state courts, changed the

---

[107]Docket No. 287.

[108]Docket No. 323.

[109]The Court dismissed Claims I(A)(5), I(A)(9), I(A)(14), I(A)(15), II, V(A)(1), V(A)(5), V(A)(6), VI(A)(1), VI(A)(2), VI(A)(3), VI(A)(4), IX(A)(1), XIII(A)(6), XIII(A)(9), XIII(A)(15), XV, XX, XXI, XXII,  XXIV, XXV, XXVI, XXVII, XXIX, XXXI, XXXII, XXXIII, XXXIV, XXXVII, XXXVIII(A)(1), XXXVIII(A)(2), XXXIX, XLI, and XLIII.

[110]Docket No. 326.

[111]Docket No. 329.

[112]Docket No. 347.

[113]Docket No. 353.

trajectory of Petitioner's case.  On April 18, 2011, Respondent asked the Court to reconsider its

order allowing factual development.[114]  The Court found that further factual development was

futile in light of *Pinholster*, and established a briefing schedule for a determination of the

remainder of Petitioner's claims.[115]

On August 18, 2011, Petitioner filed another motion to stay.[116]  He argued that he had

newly discovered and previously unavailable declarations from the Tovars stating that they had

received multiple cash payments, groceries and other items from the Provo Police Department

between the time they were identified as witnesses in April 1985 and the time they testified at

Petitioner's trial in December 1985.[117]  Based on this new evidence, Petitioner asked to stay his

federal proceedings while he returned to state court to exhaust his claims based on *Brady v.*

*Maryland*[118] and *Napue v. Illinois*.[119]

On October 24, 2011, the Court denied Petitioner's motion to stay without prejudice.  The

Court found that there were no unexhausted *Brady* or *Napue* claims currently in Petitioner's

---

[114]Docket No. 378.

[115]Docket No. 412.

[116]Docket No. 414.

[117]*Id*.  Petitioner also offered declarations from members of the Provo Police Department
that corroborated the Tovars' declarations, as well as declarations from jurors who served at
Petitioner's 1985 Trial.

[118]373 U.S. 83 (1963).

[119]360 U.S. 264 (1959).

Petition (they had been withdrawn in 2006) and therefore a *Rhines* stay was inappropriate.[120] "The proper procedure would be for Petitioner to move to amend his current petition to add the new, unexhausted claims, then seek a stay."[121]

Before Petitioner could amend his petition, on November 4, 2011, the Tenth Circuit issued an order addressing a Petition for a Writ of Mandamus that Victim's Representative, Gary Oleson, had filed.[122]  While the Tenth Circuit refused to issue the writ, it urged this Court to "hold firm to the briefing schedule and to decide the case promptly after briefing is completed."[123]  As a footnote to that sentence, the Tenth Circuit added: "To the extent Mr. Carter seeks to assert in the district court any new claims not already asserted in the habeas petition, he must follow the procedures set forth in 28 U.S.C. § 2244 for filing a second or successive § 2254 habeas petition.  *See Gonzalez v. Crosby*, 545 U.S. 524, 529-30, 532 (2005)."[124]

As a result of that directive from the Tenth Circuit, when Petitioner filed a Motion to Amend and/or Supplement the Petition[125] and a Renewed Motion to Stay Proceedings Pursuant to *Rhines v. Weber*[126] six days later, both of which were opposed by Motions to Strike filed by

---

[120]Docket No. 437.

[121]*Id*. at 5.

[122]Docket No. 445.

[123]*Id*. at 8.

[124]*Id*. at 8 n.4.

[125]Docket No. 446.

[126]Docket No. 448.

Respondent and the Victim's Representative,[127] this Court denied Petitioner's two motions and granted the two motions to strike on December 6, 2011.[128]

Petitioner asked the Court to reconsider its December 6, 2011 decision.[129] On January 20, 2012, the Court declined to do so and noted its desire to promptly resolve the remaining claims.[130]  As Petitioner's Brief on the Merits of Remaining Claims had been filed on November 23, 2011,[131] Respondent filed its response on January 23, 2012.[132]  Petitioner's Reply was submitted on February 22, 2012.[133]  The remaining claims in Petitioner's Second Amended Petition are ripe for consideration.

### III.  STANDARD OF REVIEW

The Court's review is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  "Under AEDPA, the standard of review applicable to a particular claim depends on how that claim was resolved by the state courts."[134]  If a claim has not been

---

[127]Docket Nos. 452 and 456.

[128]Docket No. 477.

[129]Docket No. 479.

[130]Docket No. 491.

[131]Docket No. 466.

[132]Docket No. 491.

[133]Docket No. 495.

[134]*Byrd v. Workman*, 645 F.3d 1159, 1165 (10th Cir. 2011).

adjudicated by the state courts, then de novo review applies.[135]  If, however, the state court has adjudicated the claim on the merits, the Court may grant relief only if the state court's determination "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[136]

A federal court may not issue the writ of habeas corpus simply because it concludes that the state court applied the law erroneously or incorrectly.[137]  Rather, the Court must be convinced that the application was also objectively unreasonable.[138]  The Supreme Court has made clear that "this standard is difficult to meet."[139]

> It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice

---

[135]*Id.* at 1166.

[136]28 U.S.C. § 2254(d)(1), (2).  "In applying § 2254(d), we first determine whether the principle of federal law on which the petitioner's claim is based was clearly established by the Supreme Court at the time of the state court judgment.  [C]learly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case sub judice.  Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context.  The absence of clearly established federal law is dispositive under § 2254(d)(1)." *Welch v. Workman*, 639 F.3d 980, 991 (10th Cir. 2011) (alteration in original) (quotation marks and citations omitted).

[137]*McLuckie v. Abbott*, 337 F.3d 1193, 1197 (10th Cir. 2003).

[138]*Id.*

[139]*Harrington v. Richter*, 131 S.Ct. 770, 786 (2011).

systems, not a substitute for ordinary error correction through appeal.  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.[140]

In addition to establishing deferential legal review, AEDPA also directs federal courts considering habeas corpus petitions to defer to the factual findings of the state courts.[141] Moreover, the federal court's factual review is limited to the record before the state court that adjudicated the claim on the merits.[142]

## IV.  DISCUSSION

Based on the Court's prior decisions and Petitioner's subsequent withdrawal of certain claims,[143] the following claims remain before the Court: I, III, V, VII, VIII, X, XI, XVI, XVII, XVIII, XXIII, and XLII.  Each is discussed below.

A.     CLAIM I

Claim I asserts that Petitioner was denied the effective assistance of counsel during his 1985 trial.  Specifically, Petitioner argues that Mr. McNeil failed to familiarize himself with Utah law, to review and/or copy the prosecutor's file, and to properly investigate and challenge the voluntariness of Petitioner's statement to the police.

---

[140]*Id*. at 786-87 (quotation marks and citation omitted).

[141]28 U.S.C. § 2254(e)(1) (factual findings are presumed correct unless rebutted by clear and convincing evidence).

[142]*See Pinholster*, 131 S.Ct. at 1398.

[143]Docket No. 466 at 7, 42 n.29, 45 n.32.

1.    *Standard of Review*

The parties disagree as to whether a de novo standard or the deferential standard of 28 U.S.C. § 2254(d) applies to this claim.  The Court reviews this claim under § 2254(d).

Section 2254(d)'s deferential standard  applies to a "claim that was adjudicated on the merits in State court proceedings."[144]  Petitioner argues that the Utah Supreme Court did not address all of his ineffective assistance claims on the merits and that, as a result, the Court must conduct a de novo review and consider evidence that was not before the state court.

Respondent disagrees, arguing that Petitioner waived any argument that the Utah Supreme Court did not address his ineffective assistance claims on the merits and that the Utah Supreme Court did, in fact, resolve Petitioner's ineffective assistance claims on the merits.

Petitioner replies that he did not waive his argument but, rather, was silent on the issue of whether the Utah Supreme Court adjudicated his ineffective assistance claim on the merits. Petitioner argues that he waited and raised the issue with this Court at the appropriate time, to wit, in his merits brief currently before the Court.

As discussed above, the Court initially allowed Petitioner to conduct further factual development and Respondent sought reconsideration of the Court's order in light of *Cullen v. Pinholster*.  In his motion for reconsideration, Respondent argued that all of Petitioner's remaining claims, save one, were adjudicated by the Utah state courts on the merits.  Petitioner responded that *Pinholster* did not categorically bar further factual development and that the Court should wait to determine its review.  Petitioner did not argue that the Utah court had failed to

---

[144]28 U.S.C. § 2254(d).

determine any of his remaining claims on the merits.  In its order granting Respondent's motion for reconsideration, the Court noted that Petitioner did not "dispute that all but one of his claims were adjudicated by the state court on the merits."[145]  Respondent now argues that this language precludes any consideration of Petitioner's argument that the state courts did not adjudicate his claims on the merits.  The Court disagrees.

Whether the Utah Supreme Court adjudicated a claim on the merits is determined by what occurred in that court, not the statements or silence of counsel, as Respondent suggests. "'Adjudicated on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground."[146]  "An adjudication on the merits is perhaps best understood by stating what it is not: it is not the resolution of a claim on procedural grounds."[147]  The Supreme Court has held that "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."[148]

---

[145]Docket No. 412, at 5.

[146]*Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001).

[147]*Muth v. Frank*, 412 F.3d 808, 815 (7th Cir. 2005); *see also Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999) (finding that an "adjudication on the merits" occurs when "the decision was reached on substantive rather than procedural grounds").

[148]*Richter*, 131 S.Ct. at 784-85.

Section "2254(d) does not require a state court to give reasons before it can be deemed to have been 'adjudicated on the merits.'"[149]

The Utah Supreme Court considered Petitioner's ineffective assistance of counsel claims in *Carter I*, *Carter II*, and *Carter III*.  Claim I addresses those claims raised in *Carter I*.

         *a.*       *Carter I*

On direct appeal, Petitioner and amicus curiae raised the issues of 1985 trial counsel's alleged ineffectiveness.  In his Supplemental Brief, Petitioner argued that "[c]ounsel failed to request discovery and evaluate the evidence in the hands of the State."[150]  The amicus curiae brief also argued that 1985 trial counsel was ineffective for failing to make a motion for discovery and failing to review the prosecution file.[151]  Amicus curiae further took issue with the fact that, at the hearing on the motion to suppress the confession, counsel elicited no evidence as to whether Petitioner was afforded his Sixth Amendment right to counsel.[152]  Thus, these issues were clearly before the Utah Supreme Court, and the court made clear that it had reviewed all of these claims and found them to be "without merit."[153]

In the introductory paragraphs of *Carter I*, the Utah Supreme Court stated it could "'*review* errors raised and briefed on appeal in death penalty cases, even though no proper

---

[149]*Id*. at 785.

[150]Docket No. 111, Addendum M, Supplemental Brief of Defendant-Appellant, at 6.

[151]*Id*., Addendum M, Amicus Curiae Brief, at 34-35.

[152]*Id*. at 36.

[153]*Carter I*, 776 P.2d at 896.

objection was raised at trial.'"[154]  The court further stated that it had "'the power to *notice* manifest ('palpable') error apparent in the record *and correct* a conviction based upon the same if the error is prejudicial, even though such error is not objected to at trial or assigned on appeal.'"[155]

In addition, the court made clear that it "need not analyze and address in writing each and every argument, issue, or claim raised and properly before us on appeal.  Rather, it is a maxim of appellate review that the nature and extent of an opinion rendered by an appellate court is largely discretionary with that court."[156]

> In applying this principle to cases before us, we have, after fully considering the substance of particular claims raised on appeal, summarily (and often without written analysis) dismissed the same as meritless or of no effect.  Use of this rule in capital punishment and other cases continues to be appropriate and important in acknowledging established principles while enabling this Court, after fair and comprehensive review, to expeditiously focus judicial resources and energy on those critical or outcome-determinative issues which may be raised in any given case and/or which have not in substance been previously urged upon this Court and rejected.  Accordingly, after fully reviewing every claim raised in the instant case, we discuss at length only those issues critical to this appeal.[157]

Despite limiting the scope of what it was required to address in writing, the court chose to discuss its resolution of Petitioner's ineffective assistance of counsel claims.  The court correctly summarized the *Strickland* standard.  The court then concluded, for a variety of reasons, that Petitioner's ineffective assistance of counsel claims "are, for the most part, without merit":

---

[154]*Id*. at 888 (quoting *State v. Tillman*, 750 P.2d 546, 553 (Utah 1987)).

[155]*Id*. (quoting *Tillman*, 750 P.2d at 553).

[156]*Id*.

[157]*Id*. at 889.

> After reviewing defendant's asserted claims of error in this regard, we conclude that most of his allegations of prejudice are wholly speculative and in no way give rise to the conclusion that but for counsel's unprofessional errors, the result of the proceeding would have been different.  Additionally, defendant has not sufficiently shown how the decisions made by trial counsel were not merely tactical choices or how counsel's performance fell below an objective standard of reasonable professional judgment.  Other claims are clearly not supported by the record. . . .  Accordingly, defendant's claims of ineffective assistance of counsel are, for the most part, without merit.[158]

Petitioner focuses on the language from the court indicating that his ineffective assistance of counsel claims were "for the most part" without merit.  Petitioner argues that this language reveals the court found some, but not all, of his ineffective assistance claims to be without merit.  Therefore, Petitioner argues, this Court's review of his ineffective assistance of counsel claims is de novo and *Pinholster*'s limitation on the presentation of new evidence is inapplicable.

The Court rejects Petitioner's argument while recognizing that the state court could have been more precise in its language, especially given the deferential weight that must be accorded to such an adjudication.  It is fair for Petitioner to argue that the court's use of the phrase "for the most part" and the limiting word of "most" signals some uncertainty as to whether the Utah Supreme Court addressed all of the ineffective assistance claims on the merits.  Indeed, the logical implication of those words is that there were ineffective assistance of counsel claims that did have merit, even if, "for the most part" they did not.

Despite the easy appeal of this argument, however, it rests on four words taken out of the context of the rest of the *Carter I* decision and ignores the import of the other language contained therein.  The Utah Supreme Court made clear that it reviewed all of the claims presented on

---

[158]*Id*. at 893-94 (quotation marks and citation omitted).

appeal and had the authority to notice and correct other errors, even if not raised at trial or on

appeal.  The court also made clear that it reviewed all of the claims raised by Petitioner, even if it

did not analyze and address each claim in writing.  The court concluded by stating that it had

"reviewed defendant's other claims raised on appeal and finds them to be without merit."[159]  The

Court therefore concludes that the Utah Supreme Court addressed Petitioner's ineffective

assistance claims on the merits.

Petitioner also argues that the *Carter I* court failed to address the performance prong of

the *Strickland* test.  The court stated, however, that Petitioner had "not sufficiently shown how

the decisions made by trial counsel were not merely tactical choices or how counsel's

performance fell below an objective standard of reasonable professional judgment."[160]  That

language reflects review and analysis under the performance prong standard established by

*Strickland*.[161]  Thus, the Utah Supreme Court considered and rejected Petitioner's performance

prong-based claims.  Based on this, the Court finds that the Utah Supreme Court addressed each

of Petitioner's ineffective assistance claims, including the performance prong, on the merits and

that the deferential standard of § 2254(d) applies.

---

[159]*Id*. at 896.

[160] *Id*. at 894.

[161]*Strickland*, 466 U.S. at 687-88 ("When a convicted defendant complains of the
ineffectiveness of counsel's assistance, the defendant must show that counsel's representation
fell below an objective standard of reasonableness.").

b.    *Carter II*

In *Carter II*, the court was again presented with ineffective assistance of counsel claims, namely that appellate counsel in *Carter I* failed to investigate and support the underlying claim that Mr. McNeil was ineffective during the 1985 trial.  This is addressed in Claim VII.  In considering the claim, the Utah Supreme Court applied *Strickland*, stating that there must be a showing of "deficient performance in some demonstrable manner, which performance fell below an objective standard of reasonable professional judgment" and "that counsel's performance prejudiced the defendant."[162]

The court noted that Petitioner raised ineffective claims in *Carter II* similar to those raised in *Carter I*.  Specifically, the court quoted from Petitioner's *Carter I* brief in laying out the ineffective assistance claims before it (including claims related to counsel's investigative efforts) and, after doing so, stated: "We reaffirm our conclusion in *Carter I* that Carter's claims of ineffective assistance of counsel are . . . without merit."[163]

c.    *Carter III*

Petitioner's ineffective assistance of counsel claims on appeal from his state post-conviction appeal address the conduct of his appellate counsel.  Accordingly, they are discussed under Claim VII and Claim XVII below.

---

[162]*Carter II*, 888 P.2d at 640 (quotation marks and citation omitted).

[163]*Id.* at 640-41 (citing to *Carter I*, 776 P.2d at 894) (internal quotations omitted).

41

2.      *Discussion*

Because the state court adjudicated Petitioner's ineffective assistance of counsel claims on the merits, the Court may grant relief only if the state court's determination "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."[164]   Further, this Court's review is limited to the evidence before the state court when it made its decision.[165]   Petitioner argues that the Utah Supreme Court's decision in *Carter I* was contrary to, or involved an unreasonable application of clearly established federal law as determined by the Supreme Court, in this instance, *Strickland v. Washington*.

a.      *Inappropriate Standard*

Petitioner first argues that the Utah Supreme Court erred by imposing a "but for" test for prejudice instead of considering whether there is a probability sufficient to undermine confidence in the outcome.[166]   In *Strickland*, the Supreme Court stated: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome."[167]   To establish a reasonable probability, "a defendant

---

[164]28 U.S.C. § 2254(d)(1).

[165]*Pinholster*, 131 S.Ct. at 1400.

[166]Docket No. 466, at 33.

[167]*Strickland*, 466 U.S. at 694.

need not show that counsel's deficient conduct more likely than not altered the outcome in the case."[168]

The Utah Supreme Court, in examining Petitioner's ineffective assistance claims, held that Petitioner's claims "in no way give rise to the conclusion that 'but for counsel's unprofessional errors, the result of the proceeding would have been different.'"[169]  For this proposition, the court cited *Strickland* and one of its own cases that held "prejudice means that without counsel's error there was a reasonable likelihood that there would have been a different result."[170]

While it is true that one of the cases cited by the Utah Supreme Court was its own case that used a "reasonable likelihood" test instead of a "reasonable probability" test, the court applied the correct legal standard to Petitioner's claim.  The fact that the Utah Supreme Court used imprecise language in setting out the proper standard does not alter this conclusion.[171]  Indeed other courts, including the Supreme Court in *Strickland*, have used language similar to the "reasonable likelihood" phrase used by the Utah Supreme Court.[172]  Therefore, the Court finds

---

[168]*Id*. at 693.

[169]*Carter I*, 776 P.2d at 893-94 (quoting *Strickland*, 466 U.S. at 694).

[170]*Codianna v. Morris*, 660 P.2d 1101, 1109 (Utah 1983).

[171]*See Woodford v. Visciotti*, 537 U.S. 19, 23-24 (2002).

[172]*Strickland*, 466 U.S. at 696 ("[A] court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent errors."); *see also Fadiga v. Attorney Gen.*, 488 F.3d 142, 157 n.24 (3d Cir. 2007) (collecting cases using "reasonable likelihood" standard).

that the Utah Supreme Court applied the correct legal standard to Petitioner's ineffective

assistance claim.

### b.   *Unreasonable Application*

Having determined that the Utah Supreme Court applied the correct legal standard, the

Court turns to Petitioner's argument that the court's determination of his ineffective assistance

claim was unreasonable.  As stated, Petitioner argues that trial counsel was ineffective for failing

to pursue discovery and failing to challenge the voluntariness of the confession.

### 1.   *Standard*

The Utah Supreme Court adjudicated Petitioner's ineffective assistance of counsel claims

on the merits.  Therefore, "[t]he pivotal question is whether the state court's application of the

*Strickland* standard was unreasonable."[173]

> This is different from asking whether defense counsel's performance fell below
> *Strickland*'s standard.  Were that the inquiry, the analysis would be no different
> than if, for example, this Court were adjudicating a *Strickland* claim on direct
> review of a criminal conviction in a United States district court.  Under AEDPA,
> though, it is a necessary premise that the two questions are different.  For
> purposes of § 2254(d)(1), an *unreasonable* application of federal law is different
> from an *incorrect* application of federal law.  A state court must be granted a
> deference and latitude that are not in operation when the case involves review
> under the *Strickland* standard itself.[174]

The Supreme Court in *Strickland* set out a two-part test for ineffective assistance claims.

Under this test, a petitioner must demonstrate both deficient performance and prejudice.

---

[173]*Richter*, 131 S.Ct. at 785.

[174]*Id*. (quotation marks and citation omitted).

To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."

With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."[175]

In addition, the Supreme Court explained:

The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.[176]

### 2. Additional Facts

Petitioner was represented at trial by Mr. McNeil, a Chicago lawyer who sought to change the trial venue and to suppress Petitioner's confession.[177] At the hearing on the change of venue motion, Mr. McNeil elicited testimony that Mrs. Oleson was the aunt of the Provo Chief of Police, that the media interest in the case was "fairly broad," and that various media outlets ran

[175]*Id*. at 787-88 (quoting *Strickland*, 466 U.S. at 688, 689, 687, 684, 693).

[176]*Id*. at 788 (quotation marks and citations omitted).

[177]Docket No. 173, Ex. 31 and Ex. 32.

45

stories of the murder.[178]  With regard to the motion to suppress, which is discussed in more detail

below in relation to Claim III, Mr. McNeil cross-examined the officers who interrogated

Petitioner and also called Petitioner to the stand.  Petitioner testified his confession was coerced,

because, after arresting his friend, JoAnne Robins, the Tennessee police told him that his

confession would help her.[179]

    Mr. McNeil did not present any evidence or witnesses at trial.  He responded to the

evidence and testimony put forth by the state.  For example, he cross examined several of the

state's witnesses.  While cross-examining Mr. Tovar, Mr. McNeil elicited several admissions

from Mr. Tovar: (1) that he had lied to police; (2) that he was in the country illegally; and (3) that

he withheld information about the gun until right before the trial started.  Mr. Tovar also

admitted that he drank and smoked marijuana as often as he could.[180]

    Mr. McNeil asked Lieutenant Pierpont and Sergeant Cunningham about how they

obtained Petitioner's confession, and about Ms. Robins' arrest.  Sergeant Cunningham testified

that Petitioner had expressed concern for Ms. Robins and had asked about her a number of times.

Sergeant Cunningham further testified that, if he had taken the confession, he would have used a

court reporter, which was not done in this case.  Lieutenant Pierpont further testified that

Petitioner did not write or dictate the confession, but did sign it.

---

[178]1985 Suppression Hearing Transcript at 128-31 (Bates 367-70).

[179]*Id*. at 75-76 (Bates 314-15), 78 (Bates 317), and 80-81 (Bates 319-20).

[180]1985 Trial Transcript at 725 (Bates 1165).

On cross-examination of the State's ballistic expert Mr. McNeil established that the bullet removed from Ms. Oleson could have been shot from either a .38 or a .357 caliber handgun, and that the expert could not say whether the bullet removed from Mrs. Oleson and the bullets found in Petitioner's apartment were the same.[181]  When cross-examining the pawn shop owner who sold Anne Carter the gun, Mr. McNeil also established .38 caliber handguns were common weapons, and that Petitioner himself did not buy it.

In his closing argument, Mr. McNeil stressed that the knife found next to Mrs. Oleson's body had not been linked to Petitioner through finger prints or otherwise, that the ballistics expert could not state whether the bullet was fired from a .38 or a .357, and that there was no evidence that the bullet that killed Mrs. Oleson matched those found in Petitioner's apartment.  Mr. McNeil attacked the voluntariness of the confession, as well as Mr. Tovar's credibility.  Mr. McNeil argued that the State failed to produce the gun, and that there was no evidence that Petitioner had a gun on the day of the murder.  Mr. McNeil further argued that the State failed to provide any evidence placing Petitioner at the scene, and that it would have been highly unusual for a black man to be in the neighborhood without being noticed.

### 3.    Failure to Pursue Discovery from the State

Petitioner argues that Mr. McNeil was ineffective for failing to pursue discovery from the State and from otherwise investigating Petitioner's case at the point when evidence may have

---

[181]*Id*. at 865-74 (Bates 1309-18).

been available to review.[182]   In support of this argument, Petitioner relies on an exchange that

took place between Mr. McNeil and the prosecutor during trial.

During trial, Mr. McNeil objected to the testimony of Officer Richard Mack, who took

the stand to testify about the execution of a search warrant at Petitioner's apartment.   Outside of

the presence of the jury, Mr. McNeil asserted that he had no prior knowledge about Officer

Mack's testimony.   The prosecutor stated:

> Your Honor I suppose now is as good a time as any to make the record, your
> Honor, that as I understand the Rules of Discovery in this jurisdiction, Rule
> 77-35-16 and Rule 16 Discovery, is the proper proviso whereby the defendant, if
> he has not discovered things that he desires at the preliminary hearing process, to
> make a formal written request of the prosecutor to disclose certain things.   *And I
> have never received such request, there has never been a written request for
> discovery filed in this case*, and I have not had an opportunity to respond.   And
> now if defense counsel is going to suggest in some fashion that I've got some duty
> to spread my case before him and say you may want to look at this and you may
> want to look at that, I disagree.[183]

In reply, Mr. McNeil noted that the rule did not require the request to be in writing, that

he had asked the prosecutor for Rule 16 material more than once, and that the prosecutor said he

would "make it available."[184]   Despite this, Mr. McNeil stated that he hadn't "seen any of that

[evidence] until now."[185]

---

[182]By the time that the request for the tape containing Lieutenant Pierpont's dictation was
made, it had been destroyed.   *See Carter II*, 888 P.2d at 636.   As the Utah Supreme Court noted,
that there was no verbatim recording of Petitioner's version of the statement, or even one of
Lieutenant Pierpont's dictation, made it difficult to guarantee that Petitioner's constitutional
rights were protected.   *Carter I*, 776 P.2d at 891.

[183]1985 Trial Transcript at 858 (Bates 1302) (emphasis added).

[184]*Id*. at 859 (Bates 1303).

[185]*Id*.

The prosecutor responded:

Mr. McNeil is absolutely correct, I have informed him on at least the one occasion last Friday and probably two occasions, that my files are available in the County Attorney's office, he is free to come to that office and avail himself of the product that is contained therein.  And, perhaps the Court would want to inquire of him whether or not he ever actually came to the office and requested to look at any material.  *To my knowledge, he has not so done*.  And so I don't know that I've got any responsibility to go track him down and start showing him things.  Had he come to the office, my offer, has always been a standing offer, and that's the way we operate in our county attorneys [sic] office.[186]

The trial court overruled Mr. McNeil's objection, agreeing with the prosecutor that the request for the file should have been in writing and that the defense failed to make such a request:

*It doesn't appear to the Court that there has been any withholding of information, or that a proper specific request has been made by the defense.*  The Court's attention is directed to the file in this matter, documents filed as early as, it would appear to be prior to June 25, 1985, the bind-over in this case having been on June 27, 1985, the search warrant affidavit in support of the search warrant, the return on the search warrant indicating those articles that were obtained as a consequence of the search warrant; the same disclosing Brown's 38 caliber and socks, southwest bedroom, Brown's 30 caliber in bottom drawer of kitchen.  *So it does not appear to the Court that your defense can claim any surprise or that anything has been withheld by the state in this matter.  These are matters which would have been in the file, which would have been evidenced.*  The officers have been listed, at least on two occasions, those persons that were intended to be called as witnesses.  The subpoenas that are in the file have been there since the 1st of October 1985 indicate the persons that are going to be subpoenaed, one of whom is the [sic] present on the stand, Richard Mack.  The Court, therefore, is going to overrule the objection of the defendant in this matter and permit the state to proceed with examination of this witness.[187]

---

[186]*Id*. (emphasis added).

[187]*Id*. at 859-60 (Bates 1303-04) (emphasis added).

49

Mr. McNeil did not object to, nor correct, the prosecutor's assertion that he had not made a written request or reviewed the prosecution's file, nor did he challenge the court's conclusion.

A very similar exchange between the prosecutor and defense counsel is recounted in *Rompilla v. Beard* to establish that defense counsel failed to avail themselves of the prosecutor's open files before the eve of sentencing.[188]  In the *Rompilla* exchange, which occurred at some point before the sentencing hearing itself, defense counsel asked for a copy of a transcript that the prosecutor was going to read from during the sentencing hearing.  The prosecutor stated that the transcript, and the state's file, had been made available to defense counsel, but that the state did not have the duty to copy and provide the file to the defense.  Defense counsel conceded later that even after this exchange she only reviewed the transcript the night before the sentencing hearing and did not examine any other evidence in the file.

Reviewing those facts, the Supreme Court stated: "With every effort to view the facts as a defense lawyer would have done at the time, it is difficult to see how counsel could have failed to realize that without examining the readily available file they were seriously compromising their opportunity to respond to a case for aggravation."[189]

---

[188]545 U.S. 374 (2005).  Though *Rompilla* involved the failure of defense counsel to obtain the prosecution's file prior to a capital sentencing hearing, it is applicable here.  This is especially true because, as discussed below in Claim XXIII, in Utah aggravating factors are considered during the guilt phase.

[189]*Id*. at 385.

The Court went on to state:

> The notion that defense counsel must obtain the information that the State has and
> will use against defendant is not simply a matter of common sense. . . .  [T]he
> American Bar Association Standards for Criminal Justice in circulation at the time
> of Rompilla's [and Petitioner's] trial describes the obligation in terms no one
> could misunderstand in the circumstances of a case like this one:
> *It is the duty of the lawyer to conduct a prompt investigation of the circumstances*
> *of the case and to explore all avenues leading to facts relevant to the merits of the*
> *case and the penalty in the event of conviction.  The investigation should always*
> *include efforts to secure information in the possession of the prosecution and law*
> *enforcement authorities.*  The duty to investigate exists regardless of the accused's
> admissions or statements to the lawyer of facts containing guilt or the accused's
> stated desire to plead guilty.[190]

The Supreme Court further stated that "[i]t flouts prudence to deny that a defense lawyer

should try to look at a file he knows the prosecution will cull for aggravating evidence . . . ."[191]

"[L]ooking at a file the prosecution says it will use is a sure bet: whatever may be in that file is

going to tell defense counsel something about what the prosecution can produce."[192]

Because defense counsel in *Rompilla* failed to look at the prosecution's file, the Court

found that counsel's performance was deficient and that the state court's determination of the

issue was an unreasonable application of clearly established federal law.

After concluding that the performance by Rompilla's counsel was constitutionally

deficient under *Strickland*, the Court analyzed whether Rompilla was prejudiced by that

---

[190]*Id*. at 387 (citing 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.))
(emphasis added).

[191]*Id*. at 389.

[192]*Id*.

deficiency.[193]   The Court conducted a de novo review, as the state courts below had never

reached the issue of prejudice.[194]   After reviewing what Rompilla's counsel would have found if

they had obtained the prosecutor's file, the Court concluded that the likelihood of a different

result was "'sufficient to undermine confidence in the outcome.'"[195]   Accordingly, the Court

granted the writ of habeas corpus.

With this standard in mind, this Court turns to the facts before it.  As set forth above, Mr.

McNeil argued that he had no notice of a witness's testimony.  The prosecutor responded that the

witness information had been available in the prosecutor's file, that Mr. McNeil had never made

a written request for the file, and that, to the prosecutor's knowledge, Mr. McNeil had not

reviewed the file at the County Attorney's office.

Though the record on this issue has not been developed further, the Court finds it

extremely unlikely that the prosecutor would not have known if Mr. McNeil had visited the

County Attorney's office to review or copy the file.  Further, the State never asserted that Mr.

McNeil did obtain the file.  Indeed, in its briefs to the Utah Supreme Court in *Carter I*, the State

conceded that Mr. McNeil's performance may have been deficient, and limits its rebuttal to the

argument that Petitioner was not prejudiced by that deficiency.[196]   Thus, the only conclusion this

---

[193]*Id.* at 390-93.

[194]Significantly, the state did not contest the claim of prejudice in *Rompilla*.  *Id*. at 390.

[195]*Rompilla*, 545 U.S. at 393 (quoting *Strickland*, 466 U.S. at 694).

[196]Docket No. 111, Addendum M, Respondent's Response to Amicus Curiae Brief, at 18
("The ACLU argues that defendant was denied effective assistance of counsel at trial.  Although
it points to conduct by counsel that may raise questions concerning deficient performance, the
ACLU fails to satisfy the demonstrable prejudice prong of the ineffectiveness test."); *id*.,

Court can reach is that Mr. McNeil did not receive or review the prosecutor's file during the 1985 trial.

If Mr. McNeil did not review or obtain the prosecutor's file prior to trial, and the record is that he did not, his performance would clearly be deficient and the Utah Supreme Court's determination that Petitioner's ineffective assistance claim was "without merit" would be an unreasonable application of clearly established federal law. The Court, however, need not decide this issue.

As *Rompilla* demonstrated, it would not be enough for this Court to conclude that Mr. McNeil's conduct fell below that expected of defense lawyers in a capital case in 1985.[197] The Court must also analyze whether Petitioner was prejudiced by Mr. McNeil's failure to review the file such that "'but for counsel's unprofessional errors, the result of the proceeding would have been different.'"[198] Since the Utah Supreme Court in *Carter I* found that Petitioner could not establish prejudice on his ineffective assistance of counsel claims, the Court must apply the "'doubly deferential' standard of *Strickland* and AEDPA."[199] Thus, the Court must determine whether the Utah Supreme Court's resolution of this issue was unreasonable. Having reviewed

---

Addendum M, Second Supplemental Brief of Respondent, at 9 ("Defendant claims that he received ineffective assistance of counsel because counsel was unprepared for trial and because of the lack of mitigating evidence presented at penalty phase. Defendant's claims, while they may establish deficient performance, do not establish demonstrable prejudice . . . .").

[197]*Rompilla*, 545 U.S. at 390-93.

[198]*Richter*, 131 S.Ct. at 787 (quoting *Strickland*, 466 U.S. at 694).

[199]*Pinholster*, 131 S.Ct. at 1410.

the record before the Utah Supreme Court, the Court cannot find that its determination of the prejudice prong of *Strickland* was unreasonable.

Petitioner argues that if Mr. McNeil had reviewed the prosecutor's file prior to trial, he would have discovered: (1) police reports regarding other suspects; (2) a lack of forensic evidence linking Petitioner to the Oleson home despite numerous lab reports; and (3) forensic reports that could have been used to suggest another person was responsible for the murder.[200]

Even if Mr. McNeil had these items, there is not a reasonable probability that the outcome of the 1985 trial would have been different.  While the police may have considered other suspects, such as Mr. Oleson, Petitioner was the only suspect who confessed to the murder, and his confession was corroborated by witness testimony.[201]  There is not a reasonable probability the jury would have concluded otherwise.  Moreover, even without forensic evidence suggesting another perpetrator, Mr. McNeil did put forth and the jury did consider, that Petitioner's fingerprints were not on the knife found next to Mrs. Oleson.  Likewise, the jury heard that the State failed to produce a gun, and that the bullet used could have come from a gun other than the one purchased by Anne Carter.  Moreover, the presence of Mr. Oleson's hair on his wife's sweater is explainable, does not implicate him in his wife's death, and does nothing to undermine

---

[200]It is unclear if these items were before the Utah Supreme Court in *Cater I*, but the Court will assume for the sake of argument that the Utah Supreme Court had the entire contents of the prosecution's file.

[201]While there may be reason to reconsider the reliability of the Tovars' testimony at some point, the prosecutor's file in 1985 would not have had the new declarations from the Tovars that Petitioner points to now.

Petitioner's culpability as reflected by his confession.[202]  Finally, as noted above, even without

the file, Mr. McNeil was active in court and provided pointed cross-examination.

Aside from the exchange about the prosecutor's file, the record before the Utah Supreme

Court when it decided the ineffective assistance of counsel claims did not address the scope of

Mr. McNeil's investigation prior to trial.  Given that the record is largely silent as to what Mr.

McNeil did or did not do to investigate the case and prepare for trial, and the Court's inability to

consider Petitioner's extra-record evidence, the Court cannot conclude that Mr. McNeil

performed no investigation at all.  It is true, as Petitioner argues, that Mr. McNeil was not

effective simply because he completed certain limited tasks.  But it is also true that Mr. McNeil

was not ineffective because he did not do more.

Thus, while there is a strong argument that counsel's performance was deficient,

Petitioner has not shown that the prejudice he suffered meets *Strickland*'s standard.  In this

regard, given the record before it, the Utah Supreme Court's conclusion in *Carter I* that

Petitioner failed to show how "'but for counsel's unprofessional errors, the result of the

proceeding would have been different'" was not unreasonable.[203]

Petitioner's request for habeas relief on this ground is denied.

---

[202]Docket No. 493, at 68-69.

[203]*Carter I*, 776 P.2d at 893-94 (quoting *Strickland*, 466 U.S. at 694).

4.      *Challenge to Confession*

Petitioner next contends that Mr. McNeil was ineffective because he failed to effectively investigate and challenge Petitioner's confession. The facts surrounding Petitioner's confession are set out more fully below in relation to Claim III.

The steps Mr. McNeil took to suppress the confession, however, reveal that the Utah Supreme Court's determination, based on the facts before it, that he provided legally adequate assistance was not unreasonable. Prior to trial, Mr. McNeil moved to suppress Petitioner's confession, arguing that the confession was coerced.[204]  At the 1985 Suppression Hearing, Mr. McNeil cross-examined both Lieutenant Pierpont and Sergeant Cunningham about the confession, asked questions about Ms. Robins' arrest, and argued that Petitioner's confession had been coerced. Mr. McNeil also called Petitioner to the stand. Petitioner testified that he did not recall being given his *Miranda* rights and was told that, if he confessed, Ms. Robins would be released.

Petitioner takes issue with the fact that Mr. McNeil failed to obtain a signed declaration from Ms. Robins and that, as a result, her unsigned declaration was stricken and not admitted by the trial court during the suppression hearing. Petitioner argues that Mr. McNeil should have obtained signed declarations from Ms. Robins and from Julie Hoffman, the woman who typed the confession at the Nashville police station. Petitioner argues that since his current habeas counsel now has such declarations, which the Court cannot consider under *Pinholster*, Mr.

---

[204]Docket No. 173, Ex. 31.

McNeil could have and should have done the same.  The record is silent about Mr. McNeil's

efforts, if any, to investigate the circumstances surrounding Petitioner's confession.[205]

In the end, this Court must consider whether, based on the evidence before the Utah

Supreme Court, "there is any reasonable argument that counsel satisfied *Strickland*'s deferential

standard."[206]  Mr. McNeil argued that Petitioner's confession was coerced at the 1985

Suppression Hearing and at trial, and offered Petitioner's testimony in support of this argument.

Though Petitioner argues that Mr. McNeil should have done more, and the Court agrees that

signed declarations from Ms. Robins and Ms. Hoffman would have added weight to Petitioner's

testimony, that is not the test.  The issue here is whether the Utah Supreme Court's determination

of this issue was reasonable.  The Court finds that it was, and Petitioner's request for habeas

relief on this ground is denied.

B.      CLAIM III

Claim III concerns the admission by the state courts of Petitioner's confession.  Petitioner

argues that, in deciding this issue, the Utah Supreme Court unreasonably applied clearly

established law and unreasonably determined the facts in light of the evidence in the lower court

proceedings.[207]

---

[205]What is in the record, however, is that Mr. McNeil did not have a signed copy of Ms. Robins' declaration.  *See* 1985 Suppression Hearing Transcript at 3 (Bates 242), 5-10 (Bates 244-49).

[206]*Richter*, 131 S.Ct. at 788.

[207]Petitioner does not appear to contest that § 2254(d)'s deferential standard applies to this claim because the Utah Supreme Court adjudicated this claim on the merits.

As discussed above, Mr. McNeil sought to suppress Petitioner's confession because it was coerced by psychological pressures and was induced by a promise that Petitioner's friend, Ms. Robins, would be released from jail to care for her children.

At the 1985 Suppression Hearing, Lieutenant Pierpont and Sergeant Cunningham testified that Petitioner was informed of his *Miranda* rights, that he waived those rights, and that he voluntarily confessed after being questioned.  The officers testified that Petitioner was allowed to smoke, drink water, and use the restroom.  The officers further testified no threats were made, especially with regard to Ms. Robins.

Petitioner, on the other hand, testified that he could not recall receiving his *Miranda* warnings, but did acknowledge that his signature was on the waiver forms.  Petitioner also testified that the officers repeatedly threatened that Ms. Robins would be criminally charged and be separated from her children if he refused to testify.

At the conclusion of the hearing, the trial court denied the motion to suppress, finding that Petitioner's confession was not coerced.

In considering Petitioner's challenge to the trial court's decision, the Utah Supreme Court in *Carter I* cited to its decision in *State v. Bishop*, which discusses at length United States Supreme Court jurisprudence concerning the voluntariness of confessions.[208]   The Utah Supreme Court made clear that the burden was on the government to prove, by at least a preponderance of the evidence, that the confession was voluntary.[209]   The court further stated that "[v]oluntariness

---

[208]*Carter I*, 776 P.2d 890 (citing *State v. Bishop*, 753 P.2d 439, 463-64 (Utah 1988)).

[209]*Id.*

is determined by the totality of the circumstances of the accused and his or her interrogation."[210]

Applying this standard, and examining the record below, the court concluded that Petitioner's

"statements were voluntarily made."[211]  The Utah Supreme Court re-affirmed that decision in

*Carter II.*[212]

Petitioner argues that, in deciding this issue, the Utah Supreme Court unreasonably

applied clearly established law and unreasonably determined the facts.  The clearly established

law at the time of the Utah Supreme Court's decision required that the state prove the

voluntariness of a confession by the preponderance of the evidence.[213]  In determining whether a

statement is voluntary, the court looks to the totality of the circumstances.[214]  Some of the factors

to be considered include the youth of the accused, a lack of education or low intelligence, a

failure to advise the accused of his constitutional rights, the length of detention, the repeated and

prolonged nature of the questioning, and the use of physical punishment.[215]  This was the

standard the Utah Supreme Court applied to analyze Petitioner's claim.[216]

---

[210]*Id.*

[211]*Id.*

[212]*Carter II*, 888 P.2d at 641 ("[W]e remain convinced that under the totality of the circumstances, the State met its burden of proof and that the trial court correctly admitted the confession.").

[213]*Lego v. Twomey*, 404 U.S. 477, 489 (1972).

[214]*Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

[215]*Id.*

[216]*Carter I*, 776 P.2d at 890 (citing *Bishop*, 753 P.2d at 463-64).

Petitioner argues that the Utah Supreme Court's application of this standard was unreasonable. To do so, Petitioner relies on new evidence that was not part of the record before the Utah Supreme Court. Specifically, Petitioner cites to the declarations of Ms. Robins, now Mrs. Roberson, and Julie Hoffman, the person whose name is listed on the transcribed confession. However, since this claim was adjudicated by the Utah Supreme Court on the merits, this Court's review is limited to the record that was before the state court, and such evidence may not be considered.[217]

In reviewing the record before the Utah Supreme Court, the Court cannot find that it unreasonably applied clearly established law. As stated, the Utah Supreme Court considered the totality of the circumstances when it considered the testimony of Sergeant Cunningham, Lieutenant Pierpont, and Petitioner. Both officers testified that they informed Petitioner of his *Miranda* rights, which he waived. Both officers also testified that they did not make any threats or promises to Petitioner, specifically no threats or promises were made with respect to Ms. Robins. Though Petitioner testified differently, he did acknowledge that his signature was on the *Miranda* waiver forms. Based on this evidence, the Court cannot conclude that the Utah Supreme Court unreasonably applied clearly established law in determining that Petitioner's confession was voluntary. Nor can the Court find that the Utah Supreme Court unreasonably determined the facts.

---

[217]*Pinholster*, 131 S.Ct. at 1400 & n.7; 28 U.S.C. § 2254(d)(2).

Petitioner argues that his intellectual deficiencies "made him particularly susceptible to the coercive atmosphere of custodial interrogation."[218]  In support, however, Petitioner again cites to evidence that was not before the Utah Supreme Court.  At the 1985 Suppression Hearing, the officers testified that they were unaware of Petitioner's educational background and IQ, and that Petitioner understood what they were discussing.[219]  While Petitioner's mental ability is a factor to be considered in determining whether the confession was voluntary, the record does not show that his intellectual abilities played any part in his confession.[220]

Petitioner contends that the officers threatened to take away Ms. Robins' children if he did not confess.  In support of his argument that these threats made his confession involuntary, Petitioner cites to *Lynumn v. Illinois*.[221]  *Lynumn* is clearly distinguishable.  In *Lynumn*, the petitioner was "encircled" by three police officers who threatened that her financial aid would be cut off and her children taken away from her if she did not cooperate.[222]  The *Lynumn* petitioner testified that the officers told her she would go to prison for 10 years and that she only confessed to protect her children.[223]

---

[218]Docket No. 466, at 39.

[219]1985 Suppression Hearing Transcript at 40-41, 59 (Bates 279-80, 298).

[220]*See Colorado v. Connelly*, 479 U.S. 157, 164 (1986).

[221]372 U.S. 528 (1963).

[222]*Id*. at 534.

[223]*Id*. at 532.

Here, there was no threat lodged against Petitioner or his children.  Rather, Petitioner's testimony was that the officers stated that Ms. Robins might lose her children.  Further, the facts in *Lynumn* were largely undisputed,[224] whereas here there was a dispute about whether threats were made regarding Ms. Robins and her children.  Therefore, *Lynumn* does not render the Utah Supreme Court decision on this issue unreasonable.

Petitioner also attacks the method by which the confession was dictated.  *Carter I* details the method of dictation.  Lieutenant Pierpont dictated the confession into a dictation machine, "stopping after every few lines to ask defendant whether what was dictated was accurate."[225]  A secretary typed the statement dictated by Lieutenant Pierpont and Petitioner signed it.  Though the Utah Supreme Court upheld the admission of the confession, it did "not sanction the particular manner in which it was recorded."[226]  The court believed the better procedure was to record an individual's statements verbatim, but was unwilling to overturn the admission of the confession on that ground.  While Petitioner also attacks the method of dictation, he has failed to provide anything showing that the Utah Supreme Court's decision on this issue was contrary to, or an unreasonable application of, clearly established federal law.  Therefore, the Court rejects this argument and denies habeas relief on this claim.

---

[224]*Id*.

[225]*Carter I*, 776 P.3d at 890. Petitioner disputed this at the 1985 Suppression Hearing.

[226]*Id*. at 891.

C.    CLAIM V

Petitioner's arguments in Claim V concern the prosecutor's allegedly improper comments

on Petitioner's right to remain silent during trial and the prosecutor's allegedly improper

vouching for witness Lucia Tovar.

    *1.    Improper Comment*

With respect to his claim that the prosecutor improperly commented on his silence,

Petitioner argues that the Utah Supreme Court unreasonably applied clearly established federal

law and unreasonably determined the facts in light of the evidence before that court.

At issue is the following statement made by the prosecutor during closing argument:

> I heard no evidence, evidence, [sic] from the witness stand about coercion or
> about inducing somebody to say anything about something that didn't happen.  I
> heard no evidence that supports any other theory in this case than the theory that
> was presented by the State of Utah, that he's guilty of first degree murder.[227]

In considering this claim, the Utah Supreme Court looked to its decision in *State v.*

*Tillman*.[228]  *Tillman* holds that "[d]irect reference by a prosecutor to a defendant's decision not to

testify is always a violation of the defendant's fifth amendment right against self-

incrimination."[229]  But indirect references to a defendant's failure to testify are constitutionally

impermissible only "if the comments were manifestly intended to be or were of such a character

---

[227]*Id*.; *see also* 1985 Trial Transcript at 942 (Bates 1386).

[228]*Carter I*, 776 P.3d at 891 (citing *State v. Tillman*, 750 P.2d 546 (Utah 1987)).

[229]*Tillman*, 750 P.3d at 554 (citing *Griffin v. California*, 380 U.S. 609, 615 (1965)).

that the jury would naturally and necessarily construe them to be a comment on the defendant's failure to testify."[230]

After setting out this standard, the Utah Supreme Court in *Carter I* addressed the comment at issue in Carter's case: "While clearly not a direct reference, we do not believe after reviewing the record that the statement in question would naturally and necessarily be construed by the jury as a comment on defendant's silence."[231]  The court reasoned that "the comment was made in the context of focusing the jury's attention on defendant's confession" and "could refer to the lack of any evidence elicited from witnesses or from officers present during defendant's confession contradicting the State's theory of the case."[232]  Further, the court found that "the statement was isolated, and the trial judge specifically instructed the jury that [t]he fact that [defendant] has not taken the witness stand must not be taken as an indication of his guilt, nor should you indulge in any presumption or inference adverse to [him] by reason thereof."[233]

It is "well settled that a prosecutor may not comment on the defendant's exercise of his or her Fifth Amendment liberty."[234]  However, "it is equally well settled that a prosecutor 'is otherwise free to comment on a defendant's failure to call certain witnesses or present certain

---

[230]*Id.*

[231]*Carter I*, 776 P.2d at 891.

[232]*Id.*

[233]*Id.* (quotation marks omitted) (alterations in original).

[234]*Matthews v. Workman*, 577 F.3d 1175, 1188 (10th Cir. 2009).

testimony.'"[235]  "[T]he dispositive legal inquiry is 'whether the language used [by the prosecutor] was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the defendant's right to remain silent.'"[236]

Reviewing the decision of the Utah Supreme Court, the Court cannot find that its determination of this issue was contrary to or an unreasonable application of clearly established federal law.  It is clear that the prosecutor's statement was not a direct reference to Petitioner's exercise of his Fifth Amendment right to remain silent.  Rather, when put in its proper context, it was a statement about the lack of evidence presented concerning Petitioner's confession.  As stated, the prosecutor is "'free to comment on a defendant's failure to call certain witnesses or present certain testimony.'"[237]  That is precisely what occurred here.  Therefore, the Utah Supreme Court's decision on this issue is not contrary to, or the unreasonable application of, clearly established federal law.  Nor did the Utah Supreme Court unreasonably determine the facts.  Therefore, Petitioner's request for habeas relief on this ground is denied.

2.    *Improper Vouching*

Petitioner argues that the prosecutor at the 1985 Trial improperly vouched for witness Lucia Tovar.[238]  In particular, Petitioner takes issue with the following statement by the

---

[235]*Id*. (quoting *Trice v. Ward*, 196 F.3d 1151, 1167 (10th Cir. 1999)).

[236]*Id*. (quoting *Battenfield v. Gibson*, 236 F.3d 1215, 1225 (10th Cir. 2001) (alteration in original)).

[237]*Id*. (quoting *Trice*, 196 F.3d at 1167).

[238]Petitioner did not address this issue in his opening brief, but did discuss it in his reply. Though the Court could elect to consider this argument waived, the Court will discuss it.

prosecutor: "You know, Lucia Tovar to me was one of the most impressive witnesses in this particular case."[239]

This claim was presented to the Utah Supreme Court on direct appeal.[240]  Though the Utah Supreme Court did not specifically mention the comment about Ms. Tovar's credibility in *Carter I*, it did state that it had reviewed all of Petitioner's claims and found "them to be without merit."[241]  This is sufficient for the Court to conclude that the Utah Supreme Court adjudicated this claim on the merits.[242]  Therefore, § 2254(d)'s deferential standard applies.

 "Argument or evidence is impermissible vouching only if the jury could reasonably believe that the prosecutor is indicating a personal belief in the witness' credibility, either through explicit personal assurances of the witness' veracity or by implicitly indicating that information not presented to the jury supports the witness' testimony."[243]

In this instance, there is nothing to suggest that the prosecutor was expressing an improper personal belief as to Lucia Tovar's credibility.  The prosecutor did not state any explicit personal assurances of her veracity, nor did he indicate that information not before the jury supported her testimony.  Rather, the prosecutor's statements, taken in context, suggest that Ms. Tovar was "impressive" because she provided testimony about what she knew: "She told you in

---

[239]1985 Trial Transcript at 909 (Bates 1353).

[240]Docket No. 111, Addendum M, Appellant's Second Supplemental Brief, at 27-28.

[241]*Carter I*, 776 P.2d at 896.

[242]*Richter*, 131 S.Ct. at 785.

[243]*Thornburg v. Mullin*, 422 F.3d 1113, 1132 (10th Cir. 2005) (quotation marks and citation omitted).

all honesty everything that she saw."[244]  Thus, the prosecutor did not improperly vouch for her

credibility and the Utah Supreme Court's decision that this claim was "without merit" was not

unreasonable.  Accordingly, Petitioner's request for habeas relief on this ground is denied.

D.      CLAIMS VII and XVIII

        Petitioner's Claims VII and XVIII concern ineffective assistance of appellate counsel.  In

Claim VII, Petitioner argues that counsel for the direct appeal in *Carter I* was ineffective for

failing to investigate and marshal evidence in support of the claim that Mr. McNeil was

ineffective.  Claim XVIII asserts that appellate counsel in *Carter II* was ineffective in failing to

raise a claim for ineffective assistance, as well as the other issues contained in his petition,[245] and

for failure to raise the issue of cumulative error.

        *Strickland* sets forth the proper standard for assessing a claim of ineffective assistance of

appellate counsel.[246]  "Thus, the petitioner must show both (1) constitutionally deficient

performance, by demonstrating that his appellate counsel's conduct was objectively

unreasonable, and (2) resulting prejudice, by demonstrating a reasonable probability that, but for

counsel's unprofessional error(s), the result of the proceeding—in this case the appeal—would

have been different."[247]

        A claim of appellate ineffectiveness can be based on counsel's failure to raise a
        particular issue on appeal, although it is difficult to show deficient performance

---

[244]1985 Trial Transcript at 909 (Bates 1353).

[245]These claims will be discussed elsewhere and will not be addressed here.

[246]*Smith v. Robbins*, 528 U.S. 259, 285 (2000).

[247]*Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003).

under those circumstances because counsel need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal.  Thus, in analyzing an appellate ineffectiveness claim based upon the failure to raise an issue on appeal, we look to the merits of the omitted issue, generally in relation to the other arguments counsel did pursue.  If the omitted issue is so plainly meritorious that it would have been unreasonable to winnow it out even from an otherwise strong appeal, its omission may directly establish deficient performance; if the omitted issue has merit but is not so compelling, the case for deficient performance is more complicated, requiring an assessment of the issue relative to the rest of the appeal, and deferential consideration must be given to any professional judgment involved in its omission; of course, if the issue is meritless, its omission will not constitute deficient performance.[248]

### 1.    *Claim VII*

Claim VII alleges that appellate counsel in *Carter I* was ineffective for failing to investigate and marshal evidence in support of the claim that Mr. McNeil provided ineffective assistance during the 1985 trial.  Petitioner also argues that appellate counsel was ineffective for failing to argue that the prosecution withheld evidence.

As discussed in Claim I, appellate counsel in *Carter I* did raise ineffective assistance claims against Mr. McNeil, as did amicus curiae.  And, as discussed in Claim I, the Utah Supreme Court rejected these claims.[249]  Carter also argued this point in *Carter III*, and the court rejected it there too: "Because appellate counsel in *Carter I* did in fact argue that Carter's trial counsel was ineffective, Carter's claim that appellate counsel was ineffective for failing to make such an argument must be rejected."[250]

---

[248]*Id*. (quotation marks and citation omitted).

[249]*Carter I*, 776 P.2d at 893-94.

[250]  *See Carter III*, 44 P.3d at 641.

In *Carter III*, Petitioner also argued that appellate counsel in *Carter I* was ineffective for failing to argue that the prosecution withheld material evidence during the 1985 trial.  The court stated: "We find no merit to this argument.  There is no support in the record for the claim that the prosecution withheld any evidence.  In fact, in *Carter II*, we specifically pointed out that the State had an open file policy, allowing Carter to access any information the State had regarding Carter's case."[251]

Petitioner has provided nothing to suggest that the Utah Supreme Court's determination was unreasonable in law or fact when it adjudicated the issues advanced in Claim VII.  Petitioner relies, as he does in Claim I, on evidence that was not before the Utah Supreme Court and therefore evidence that this Court cannot consider under *Pinholster*.  Further, Petitioner has failed to demonstrate prejudice.  Therefore, the Court concludes that this claim fails as well.

    2.    *Claim XVIII*

Claim XVIII asserts that appellate counsel in *Carter II* was ineffective for failing to raise a claim of ineffective assistance and for failing to argue cumulative error.  Petitioner raised these arguments in his state-post conviction proceedings.

As to the first issue, the Utah Supreme Court in *Carter III* held that, since appellate counsel from the 1992 Penalty Phase Hearing was the same as trial counsel for that hearing,

---

[251]*Id*. at 640.  While this Court is limited to the record as it was before the Utah Supreme Court when it decided this claim, the Court is aware the *Brady/Napue* material being litigated in state court bears directly on this point.

appellate counsel in *Carter II* was not ineffective for not raising the ineffectiveness issue.[252]

Petitioner has provided nothing to suggest that this ruling was contrary to or an unreasonable

application of clearly established law.  Nor has he shown prejudice.  Therefore, this claim fails.

On the second issue, the Utah Supreme Court held that the issue of cumulative error was

procedurally barred because it had been raised on direct appeal.[253]  This ruling necessarily defeats

the factual basis for Petitioner's claim here because it means that appellate counsel in *Carter II*

did argue cumulative error.[254]  Further, as will be discussed below, Petitioner's cumulative error

argument is without merit.  Therefore, the Court must reject Petitioner's request for habeas relief

on this claim.

E.      CLAIM VIII

Petitioner argues that his 1992 Penalty Phase Hearing counsel was ineffective for failing

to: (1) seek the appointment of an independent mental health expert or mitigation investigator,

conduct a proper mitigation investigation, and present reasonably available mitigating evidence;

(2) remove the foreperson of the jury for cause or by exercising a peremptory challenge; and (3)

challenge the integrity of the proceedings based upon the ineffectiveness of original guilt phase

counsel and prosecutorial misconduct.  All of these arguments fail, and Petitioner is not entitled

to habeas relief on this claim.

---

[252]*Id*. at 642 ("Counsel cannot be found ineffective for failing to raise an ineffectiveness of counsel issue against himself or herself.").

[253]*Id*. at 631.

[254]Petitioner's cumulative error claims in this matter will be discussed more fully below in relation to Claims XVI and XVII.

*1.      Mitigation Evidence*

Petitioner argues that his counsel was ineffective for failing to seek the appointment of an independent mental health expert or mitigation investigator, conduct a proper mitigation investigation, and present reasonably available mitigating evidence.  Each of these claims revolve around counsel's allegedly deficient performance during the 1992 Penalty Phase Hearing. Petitioner argues that his 1992 counsel made only a "half-hearted" attempt to locate mitigating evidence and, had counsel done more, he would have uncovered a "wealth of classic mitigating evidence."[255]

*a.      Standard of Review*

In his reply brief, Petitioner argues that "[b]ecause the state court ignored . . . additional mitigation [evidence], its reasoning was [an] unreasonable application of both the facts and the law and this court is free to conduct a *de novo* review or hold a hearing on this question."[256]

As set forth above, the Utah Supreme Court ruled on this claim.  Ordinarily, this would require deferential review under § 2254(d).  However, certain courts, including the Tenth Circuit, have held that "[w]hen the state court has not considered the material evidence that a defendant submitted to support the substance of his arguments, it has not adjudicated that claim on the merits."[257]

---

[255]Docket No. 466, at 60.

[256]Docket No. 495, at 23-24.

[257]*Wilson v. Workman*, 577 F.3d 1284, 1291 (10th Cir. 2009) (en banc).

71

Petitioner argues that this is the case here.  Petitioner's argument, however, rests upon a false premise: that the state court ignored additional mitigating evidence.  Petitioner cites no evidence that was presented to, but ignored by, the trial court in his first state post-conviction proceeding or the Utah Supreme Court in *Carter III*.  Rather, Petitioner cites to evidence he supplied to the state courts in his *second* post-conviction proceeding, which remains pending before the Utah Supreme Court.  This evidence was not before the trial court or the Utah Supreme Court in his first state post-conviction action and Petitioner has withdrawn from this Court's consideration those claims that make up his second state post-conviction proceeding. Therefore, there is no merit to Petitioner's claim that the state courts ignored evidence.

Having concluded that the state court did not ignore any available material evidence, the Court finds that the Utah Supreme Court adjudicated this claim on the merits in *Carter III*. Therefore, the standard of review applicable is the deferential standard of § 2254(d). Specifically, the Court must consider "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."[258]  Further, in conducting its review, the Court "is limited to the record that was before the state court that adjudicated the claim on the merits."[259]

       *b.*    *Discussion*

The Court begins its analysis by looking at the Utah Supreme Court's ruling on this issue in *Carter III*.  In his state post-conviction proceeding, Petitioner argued that counsel failed to

---

[258] *Richter*, 131 S.Ct. at 788.

[259] *Pinholster*, 131 S.Ct. at 1398.

investigate available mitigating evidence and failed to retain the services of a mitigation expert to

investigate petitioner's background.[260]   The trial court rejected this argument stating:

> The record in this case demonstrates that Carter's trial counsel called a
> number of witnesses, including family members and a psychological expert, to
> provide evidence in mitigation.  This was not a half-hearted effort, but trial
> counsel diligently brought forth evidence available to them which was designed to
> help the jury see the man whose fate they were judging.  Counsel provided
> evidence of Carter's troubled upbringing, a disastrous marriage, a head injury
> which may have caused brain dysfunction rendering him more susceptible to
> violence, particularly when under the influence of mind or mood altering
> substances like alcohol, the love which Carter demonstrated for family members
> like nieces and nephews, and the love which his mother and sister had for him.
> All of this was offered in mitigation of the claim that he deserved the ultimate
> sanction for the murder.
>
> This is not an insubstantial body of mitigating evidence.  Particularly when
> judged by the vacuum which Carter now offers, it is not insubstantial.  If there is
> other evidence which was reasonably available to trial counsel, we do not know of
> it.  It is not enough to complain that trial counsel failed to introduce adequate
> mitigating evidence, Carter also must show what additional evidence was
> reasonably available.  He has failed in that burden.[261]

Based on this, the trial court found that Petitioner's ineffective assistance claims relating

to mitigation failed.

On appeal from that finding, the Utah Supreme Court in *Carter III* considered Petitioner's

claims "that counsel was ineffective for failing to adequately investigate available mitigating

evidence and for failing to hire a mitigation expert."[262]   The Utah Supreme Court agreed with the

---

[260]Docket No. 111, Addendum O, Appellant's Addendum III, Second Amended Petition
for Writ of Habeas Corpus and Postconviction Relief, ¶¶ 3d-3e.

[261]*Id*., Addendum O, Appellant's Addendum V, Trial Court's Ruling at 15.

[262]*Carter III*, 44 P.3d at 637.

trial court's analysis of this issue.[263]  Specifically, the court held that Petitioner "failed to demonstrate that counsel's performance, relating to the mitigation evidence provided, was deficient and fell below an objective standard of reasonable professional judgment."[264]

Based on the record before the Utah Supreme Court, that conclusion was not unreasonable.  The record before the Utah Supreme Court at the time of *Carter III* showed the following was introduced as mitigation evidence at the 1992 Penalty Phase Hearing:

Petitioner's mother, Willa Lewis, testified that Petitioner was the youngest of seven children, that when Petitioner was young they lived in a "nice neighborhood" on the south side of Chicago, that Petitioner liked to play ball, interacted well with his peers, and was close with his brother Brad.  Ms. Lewis stated that she divorced Petitioner's father when Petitioner was young and that Petitioner did not have a father figure in the home when he was growing up.  Ms. Lewis later remarried, though the man she married was an alcoholic.[265]

When Petitioner was in his teens, the family moved into a predominately Caucasian neighborhood, where Petitioner experienced racial discrimination.  Specifically, Petitioner's mother testified that he was spat on and was chased by some boys with chains.  As a result, Petitioner moved back to his old neighborhood.  Around this same time, Petitioner had trouble in school and ultimately dropped out.

---

[263]*Id.*

[264]*Id.*

[265]As discussed below, the Court is aware that Petitioner's childhood may not have been as described by his family during the 1992 Penalty Phase Hearing, but that is the version in the record to which the Court is limited.

Ms. Lewis also testified that Petitioner suffered two falls when he was young.

When he was in his early twenties, Petitioner began getting into trouble with the law.  Ms. Lewis testified that in 1981 she made the decision to move to Utah and that Petitioner moved to Utah soon thereafter.  While in Utah, Petitioner worked making furniture and spent time with other family members who lived in the area.  Ms. Lewis testified that Petitioner continued to experience racial discrimination while in Utah.  Petitioner's mother also provided testimony concerning Petitioner's involvement with Anne Carter, who later became his wife, and the fact that Ms. Carter gave their child up for adoption.  Ms. Lewis testified that her son was very hurt by this and that the adoption was very hard on him.  Ms. Lewis further testified about the difficulties Petitioner encountered by being involved in a mixed-race relationship.

Ms. Lewis provided further testimony that Petitioner had an aptitude for art.  She stated that Petitioner made her Mother's Day cards, wrote her poems, and could draw well.  Ms. Lewis testified that she loved her son and that she did not want him to die.

Petitioner's sister, Jacqueline Stover, also testified at the 1992 Penalty Phase Hearing.  Ms. Stover described her family as being "very close."  Ms. Stover described her younger brother as being shy and quiet as a child.  When Petitioner was older, he would babysit Ms. Stover's children.  She testified that he was good with children and "loves kids."  In closing, Ms. Stover stated that she, along with her entire family, loved Petitioner very much.

Petitioner's brother, Brad Carter, was the final family member to testify.  He stated that, while growing up, he was close to his younger brother.  When they were young, Petitioner and his brother would play basketball and football in their neighborhood.  Brad Carter stated that he

could not recall Petitioner having any academic problems when he was young.  Mr. Carter also provided testimony about the difficulties the family experienced when they moved to their new neighborhood.  Mr. Carter related an experience where he, his brother, and a friend were attacked, and their friend was badly beaten.

Brad Carter later moved to Utah from Illinois and encouraged Petitioner to move out as well.  Mr. Carter hoped that this would provide Petitioner an opportunity to make a fresh start. Brad Carter also provided testimony about the adoption of Petitioner's child and his failed marriage.  He further testified about the discrimination that Petitioner faced in Utah, especially with regard to his relationship with Anne Carter.  Brad Carter expressed his love for his brother.

Dr. Robert Howell, a forensic and clinical psychologist, also testified as a mitigation witness at the 1992 Penalty Phase Hearing.  Dr. Howell testified that he was a licensed psychologist in Utah, Nevada, and California.  He was a member and past-president of the Utah Psychological Association, a fellow of the American Psychological Association, a member and past-officer of the Rocky Mountain Psychological Association, a member and on the Board of Directors of the American Board of Professional Psychology, past-president of the American Board of Forensic Psychology, and the national chair of examinations of the American Board of Forensic Psychology.  In addition, Dr. Howell had taught at the University of Utah, Fresno State University, University of California at Los Angeles, and Brigham Young University.  Dr. Howell started the doctoral program in clinical psychology at BYU and was the director of the program.

Dr. Howell conducted a psychological examination of the Petitioner over several days.  In connection with his examination, Dr. Howell prepared two reports.[266]

During his testimony, Dr. Howell discussed the various tests that he performed on Petitioner during his examination.  Dr. Howell also testified that he spoke with Petitioner's mother, brother, and sister to obtain a history.  Dr. Howell also spoke with Petitioner's former spouse and others.

Dr. Howell concluded that Petitioner did not suffer from an antisocial personality disorder.  But, Dr. Howell testified that there was a good probability that Petitioner suffered from organic cerebral dysfunction, which would impair cognitive ability and impair judgment, and would be exacerbated by chemical abuse.  Dr. Howell concluded by stating that Petitioner's judgment may have been impaired in February 1985.

Dr. Howell's reports were given to the jury.  Those reports indicate that Dr. Howell met with Petitioner ten different times.[267]  Dr. Howell met with Petitioner multiple times so that he could "get to know Mr. Carter so I could feel that he would cooperate with me."[268]  Dr. Howell stated that "Mr. Carter became much more open after I got to know him better" and that "[h]e cooperated well on the things I asked him to do."[269]  In addition, the reports detailed the steps Dr.

---

[266]Dr. Howell's reports were admitted into evidence and will be discussed below.

[267]Docket No. 493, Ex. 8, at 1 ("I examined Mr. Carter on the [sic] September 25, 26, 29, and October 1, 2, 3, 11, and 16 [1990]."); *id*. Ex. 9, at 2 ("I Saw Mr. Carter on two different occasions, once on December 24, 1991 and December 31, 1991.").

[268]*Id*., Ex. 8, at 1.

[269]*Id*. at 7.

Howell took to speak with members of Petitioner's family and others, and indicate that the statements they gave to Dr. Howell were consistent with their testimony at the 1992 Penalty Phase Hearing.[270]  Dr. Howell's reports also detailed all of the materials Dr. Howell reviewed in preparing his reports and all of the tests he conducted on Petitioner, including a CT scan, an MRI, and an EEG.

Petitioner also made a statement at the 1992 Penalty Phase Hearing.  Petitioner apologized to the Oleson family and his own family.[271]  Petitioner also asked that the jury spare his life.

Petitioner's argument before this Court is that the evidence from the 1992 Penalty Phase Hearing was misleading, and that he grew up in very different conditions than those described by his mother, sister Jacqueline, and brother Brad.  Specifically, Petitioner offers gritty perspectives from his sister Lynn and brother Anthony, argues that he suffered physical and sexual abuse at the hands of family members, and describes his childhood neighborhood as poverty-stricken, crime-ridden, and violent.[272]

But the evidence that Petitioner relies upon to make this argument is new evidence; evidence that was introduced as part of his second state post-conviction proceeding that is still pending before the Utah courts.  While compelling, it cannot be considered by this Court.  This

---

[270]*Id*. at 6-7.

[271]1992 Penalty Phase Hearing Transcript, at 1261-62.

[272]Docket No. 466, at 61-66.

Court's review is limited to the evidence before the Utah Supreme Court in *Carter III*.[273]  When the Court considers that evidence, it cannot conclude that the *Carter III* court's application of *Strickland* was unreasonable.

The Utah Supreme Court considered the evidence presented in mitigation at the 1992 Penalty Phase Hearing, evidence that suggested Petitioner came from a loving family, was the subject of racial discrimination, and suffered from organic cerebral dysfunction exacerbated by substance abuse.  Based on that, the Utah Supreme Court held that with regard to this claim, Petitioner had "failed to demonstrate that counsel's performance, relating to the mitigation evidence provided, was deficient and fell below an objective standard of reasonable professional judgment."[274]  The issue before this Court "is whether the state court's application of the *Strickland* standard was unreasonable."[275]  In other words, "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."[276]  Not one, but two Utah courts faced with this question answered in the affirmative.  Given the deferential review required by § 2254(d), this Court must agree.

The cases cited by Petitioner to bolster his argument that his 1992 counsel's mitigation efforts were ineffective are not persuasive.  Counsel in *Williams v. Taylor*,[277] for example, only

---

[273]*Pinholster*, 131 S.Ct. at 1398.

[274]*Carter III*, 44 P.3d at 637.

[275]*Richter*, 131 S.Ct. at 785.

[276]*Id*. at 788.

[277]529 U.S. 362 (2000).

provided brief testimony from witnesses describing "Williams as a 'nice boy' and not a violent person."[278]  Counsel in *Williams* also provided a taped excerpt from a statement by a psychiatrist that "did little more than relate Williams' statement during an examination that in the course of one of his earlier robberies, he had removed the bullets from a gun so as not to injure anyone."[279]  Despite this paltry evidentiary showing, evidence was introduced during Williams' state habeas proceeding

> that dramatically described mistreatment, abuse, and neglect during his early childhood, as well as testimony that he was borderline mentally retarded, had suffered repeated head injuries, and might have mental impairments organic in origin.  The habeas hearing also revealed that the same experts who had testified on the State's behalf at trial believed that Williams, if kept in a structured environment, would not pose a future danger to society.[280]

The Supreme Court found that the failure to discover and introduce this evidence fell below an objective standard of reasonableness.[281]

Carter, unlike Williams, had evidence of his head injuries and low intellectual abilities introduced as mitigating factors. While there is new evidence suggesting a much darker past in Petitioner's life than previously established, there was nothing in the record before the Utah Supreme Court to indicate that counsel failed to follow leads to that new evidence.  Rather, it is clear from the record that counsel spoke to Petitioner and some of Petitioner's family members, and that their accounts of Petitioner and his past were internally consistent.  Moreover,

---

[278]*Id*. at 369.

[279]*Id*.

[280]*Id*. at 370-71 (quotation marks and citation omitted).

[281]*Id*. at 395-96.

Petitioner's 1992 counsel relied upon Dr. Howell's assessment of Petitioner and Petitioner's family, and Dr. Howell testified that he spoke to some members of Petitioner's family and conducted an investigation into potential areas of mitigation.

Petitioner's reliance on *Wiggins v. Smith*[282] fails for the same reasons.  In *Wiggins*, trial counsel's mitigation evidence came from three sources: a psychologist, a pre-sentence investigation that included a one-page account of Wiggins' personal history, and department of social service records documenting Wiggins' placement in the foster care system.[283]  Counsel in *Wiggins* failed to discover evidence relating to abuse, alcoholism, molestation, and diminished mental capacities.[284]  But here, counsel did investigate Petitioner's background and presented that evidence, including evidence of alcoholism and diminished mental capacity, during the 1992 Penalty Phase Hearing.  That more could have been discovered does not prove ineffectiveness.

Indeed, that was outcome in *Smith v. Workman*.[285]  The petitioner in *Smith* alleged that his counsel's mitigation efforts were minimal, consisting of only interviewing the petitioner, his mother, and a couple of siblings.[286]  The *Smith* petitioner argued that his counsel's performance was deficient and prejudicial because there was a "wealth" of other information available.[287]  In

---

[282]539 U.S. 510 (2003).

[283]*Id*. at 523-24.

[284]*Id*. at 524-25.

[285]550 F.3d 1258 (10th Cir. 2008).

[286]*Id*. at 1269.

[287]*Id*. at 1269-70.

reviewing counsel's actions, the Tenth Circuit noted that while counsel could have done more, it could not say that he unreasonably relied upon what he was told by his client and his client's family.[288]  "[C]ounsel cannot be faulted for failing to raise claims as to which the client has neglected to supply the essential underlying facts . . . [because] clairvoyance is not required of effective trial counsel."[289]  "Given the apparent good faith in which the counsel conducted the investigation and the lack of transparency on the part of his primary sources of information," the court could not conclude that counsel was ineffective.[290]

The same is true here.  Counsel pursued relevant lines of inquiry seeking mitigation evidence for the 1992 Penalty Phase Hearing, and relied on what Petitioner and his family revealed.  The mitigation evidence presented at the 1992 Penalty Phase Hearing reflects that. The fact that years later other family members tell a different story than the one offered as mitigation at the 1992 Penalty Phase Hearing does not mean that counsel's efforts fell below an objective standard of reasonableness, nor can this Court conclude that the Utah Supreme Court's review of this issue was unreasonable.

Petitioner also takes issue with the fact that counsel used Dr. Howell as an expert instead of requesting a mitigation specialist.  For support, Petitioner cites *Ake v. Oklahoma*.[291]  In *Ake*, the Supreme Court held that "when a defendant demonstrates to the trial judge that his sanity at

---

[288]*Id*. at 1271-72.

[289]*Id*. at 1272 (quotation marks and citation omitted) (second alteration in original).

[290]*Id*.

[291]470 U.S. 68 (1985).

the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in the evaluation, preparation, and presentation of the defense."[292]  The same is true "when the State presents psychiatric evidence of the defendant's future dangerousness."[293]  The *Ake* Court made clear that it was not holding "that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own."[294]

Petitioner's counsel at the time agreed to the professional testimony of Dr. Howell.  Dr. Howell met *Ake*'s standards:  He  "conduct[ed] an appropriate examination and assist[ed] in [the] evaluation, preparation, and presentation of the defense."[295]  Thus, Petitioner received the expert assistance required by *Ake*.  Petitioner has provided nothing to suggest that counsel's use of Dr. Howell in this regard fell below an objective standard of reasonableness or that the Utah Supreme Court's rejection of this claim was unreasonable.  Therefore, this argument fails.

Finally, Petitioner makes a number of arguments concerning the funding of his 1992 counsel.  However, those issues are not before the Court.  Based on all of the above, the Court cannot find that the Utah Supreme Court's determination of this issue was unreasonable based on the facts or the law.  Therefore, Petitioner is not entitled to habeas relief on this ground.

---

[292]*Id*. at 83.

[293]*Id*.

[294]*Id*.

[295]*Id*.

2.      *Foreperson of the Jury*

Petitioner next argues that his 1992 Penalty Phase Hearing counsel was ineffective for failing to remove juror David Nelson, either for cause or by use of a peremptory challenge. Petitioner raised this claim in his first state post-conviction petition.[296]  The trial court rejected this claim,[297] as did the Utah Supreme Court in *Carter III*, which held  "that the district court correctly dismissed Carter's claim that his 1992 penalty hearing counsel was ineffective for passing Nelson for cause because Carter has failed to satisfy either prong of the *Strickland* test."[298]  The court found that Petitioner had "not shown that counsel was inattentive or indifferent during jury selection, or that Nelson's bias was so unequivocal that there could be no justification for counsel's decision to pass him for cause, or that there [was] no plausible justification for counsel's decision."[299]  As a result, the court stated that Petitioner had "not demonstrated that counsel's performance in passing Nelson for cause was deficient below an objective standard of reasonable professional judgment."[300]  Thus, Petitioner failed to satisfy the first prong of the *Strickland* test.

---

[296]Docket No. 111, Addendum O, Appellant's Addendum III, Second Amended Petition, ¶ 3a.

[297]*Id*., Addendum O, Appellant's Addendum V, Trial Court's Ruling at 17-18.

[298]*Carter III*, 44 P.3d at 638.

[299]*Id*. at 639.

[300]*Id*.

84

The court went on to hold that Petitioner had "not satisfied the second *Strickland* prong because he has failed to show that counsel's performance prejudiced him."[301]  The court stated:

> In order to show prejudice, Carter would have to demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Carter has not done so in this case.  He has not offered any evidence to show that had counsel challenged juror Nelson for cause there is a reasonable probability that the outcome in this case would have been different.  Therefore, our confidence in the outcome is not undermined and the district court properly dismissed this claim.[302]

Despite this finding at the state level, Petitioner nevertheless argues before this Court that counsel was ineffective for failing to remove juror Nelson.  Petitioner argues that the juror held "racist views about African-Americans and religious views which indicated he felt the only appropriate sentence for murder was death."[303]  Petitioner argues that Mr. Nelson "possessed the very same qualities that led sentencing counsel to object to and remove other jurors."[304]

The juror questionnaire and voir dire record for Mr. Nelson show that Petitioner is wrong.  In his juror questionnaire, Mr. Nelson indicated that he believed in "blood atonement" which he described as doctrine whereby "[i]f you take a life you must pay for it with your life."[305]  Mr.

---

[301]*Id.*

[302]*Id.*

[303]Docket No. 466, at 68.

[304]*Id.*

[305]Docket No. 493, Ex. 26 at 6.

Nelson also indicated that he believed in the "mark of Cain" or "curse of Cain" which he described as meaning "[b]lack skin or dark skin for Cain killing Abel."[306]

Nelson was asked about these answers during voir dire.  Specifically, in relation to the "blood atonement" issue, Nelson was asked: "Is there anything in your belief system that would lead you to an automatic conclusion that he must receive the death penalty?"[307]  Nelson answered "No."[308]  Nelson was also asked about his response regarding the "mark of Cain."  Counsel asked: "Does that have anything to do with this case, in your viewpoint, given that the defendant is a black man?"[309]  Nelson answered "No."[310]

The juror questionnaire also queried: "Do you believe that members of racial minorities are more prone to commit crime than whites?" and "Do you believe that members of racial minorities are more prone to commit violent acts than whites?"[311]  In response to both questions, Mr. Nelson wrote: "Only in poverty stricken homes[.]  More likely than whites in poverty[.]"[312]  When asked about this response during voir dire, Mr. Nelson explained:

> I think that those that are in poverty situations are more prone to be involved in drugs and crime and that type of thing.  And that could be white people in a, you

---

[306]*Id.*

[307]Docket No. 493, Ex. 25 at 488.

[308]*Id.* at 489.

[309]*Id.*

[310]*Id.*

[311]Docket No. 493, Ex. 26 at 9.

[312]*Id.*

> know, in an area, black people in an area.  I think if they are, both don't have some of the same chances that other people do that are a little more well to do, then I think those people are more prone to crime and probably more prone to violence [sic] crimes.[313]

When asked whether he could make his decision on just the evidence presented in court, Mr. Nelson responded that he thought he could.[314]

On the jury questionnaire, Mr. Nelson was also asked a number of additional questions about Petitioner's race.  Mr. Nelson responded that knowing that Petitioner was black would not make it difficult to serve as a fair and impartial juror, that Petitioner's race would not influence any decision that he had to make, and that it made no difference that Petitioner was a black man and the victim was a white woman.[315]  Further, Nelson stated that, if selected as a juror, he would be able to make his decision without regard to Petitioner's race.[316]

Mr. Nelson was also asked a number of questions, on both the questionnaire and during voir dire, about the death penalty.  Mr. Nelson stated that he believed "in the death penalty when it is is [sic] premeditated murder."[317]  When asked how he felt about the death penalty, knowing that if selected as a juror he might be called upon to make a decision whether a person should receive it, Mr. Nelson stated: "It scares me.  And would haunt me.  But would vote for it if was

---

[313]Docket No. 493, Ex. 25 at 489-90.

[314]*Id.* at 490.

[315]Docket No. 493, Ex. 26 at 9.

[316]*Id.* at 10.

[317]*Id.* at 31.

needed."[318]  Mr. Nelson further stated that he believed that capital punishment was needed in some situations.[319]  Mr. Nelson stated that the death penalty was warranted in cases of "cold blooded premeditated murder."[320]

During voir dire, Nelson explained what kind of murder he believed would warrant the death penalty:

> [T]o me it would be a torture, you know, not just the act of killing someone but, you know, dismemberment, things that you read about today and some of it major crime that's back east of a number of killings; things like that to me would be a, you know, a capital punishment or a death sentence.[321]

Mr. Nelson further stated that he could follow the court's instructions concerning aggravating and mitigating circumstances, as well as the instructions about whether death was appropriate.[322]  On several areas of the juror questionnaire, Mr. Nelson stated that he could follow the court's instructions and reach a decision based on his own judgment.[323]

Mr. Nelson was also asked whether he had made a prejudgment about whether Petitioner should receive the death penalty or life imprisonment.  In both the questionnaire and voir dire, he stated that he had not.[324]

---

[318]*Id.*

[319]*Id.*

[320]*Id.* at 32.

[321]Docket 493, Ex. 25 at 492.

[322]*Id.* at 493, 498-99.

[323]Docket No. 493, Ex. 26 at 29-30.

[324]*Id.* at 29; Docket No. 493, Ex. 25 at 494.

At the end of the voir dire, the State and Petitioner's counsel passed Mr. Nelson for cause. Petitioner's counsel did not use a peremptory challenge to strike Mr. Nelson.

Petitioner argues in Claim VIII that his 1992 Penalty Phase Hearing counsel was ineffective for failing to remove Nelson. As stated, the Utah Supreme Court rejected this claim in *Carter III*. Therefore, the inquiry for this Court is whether "the state court's application of the *Strickland* standard was unreasonable."[325] In making this determination, the Court considers "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."[326] Having reviewed the record, the Court finds that there is a reasonable argument that 1992 penalty phase counsel satisfied *Strickland* when counsel chose not to remove Nelson.

To succeed on a claim under *Strickland*, Petitioner must show both that his counsel's performance was deficient and that he was thereby prejudiced. The Tenth Circuit has noted that "[a]n attorney's actions during voir dire are considered to be matters of trial strategy. A strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill chosen that it permeates the entire trial with obvious unfairness."[327] In addition, the Tenth Circuit has found that "the use of peremptory challenges to construct a fair and impartial jury panel will normally fall squarely within the realm of a tactical trial decision."[328]

---

[325]*Richter*, 131 S.Ct. at 785.

[326]*Id*. at 788.

[327]*Nguyen v. Reynolds*, 131 F.3d 1340, 1349 (10th Cir. 1997) (citation omitted).

[328]*United States v. Taylor*, 832 F.2d 1187, 1196 (10th Cir. 1987).

Petitioner has failed to show how counsel's performance during jury selection for the 1992 Penalty Phase Hearing was deficient. Petitioner cites to *Morgan v. Illinois*,[329] which holds that due process requires a voir dire examination of a potential juror's views on the death penalty in capital cases.[330] In this case, Mr. Nelson and other potential jurors were asked about the death penalty, and Mr. Nelson stated that he would not automatically impose the death penalty and that he would follow the court's instructions in determining the appropriate sentence. Therefore, *Morgan* does not warrant a different conclusion.

Petitioner also argues that his counsel was ineffective because three other jurors (Messrs. Parr, Terry, and Anderson) who expressed views similar to those held by Mr. Nelson, were removed for cause. A review of the statements made by the other potential jurors, however, makes clear the differences between them and Mr. Nelson, and strengthens the conclusion that the decision to pass Mr. Nelson for cause was a strategic one.

Mr. Parr indicated that he believed racial minorities were less law abiding and more prone to commit crime, including violent crime, than whites.[331] Mr. Parr indicated that while he did not have negative feelings toward the legal system and its participants,[332] he felt that defense attorneys sometimes coached their clients to lie.[333] Further, Mr. Parr indicated that he had

---

[329]504 U.S. 719 (1992).

[330]*Id*. at 729-31.

[331]Docket No. 493, Ex. 28 at 9-10.

[332]*Id*. at 10.

[333]*Id*. at 19.

negative feelings toward those accused of crimes,[334] and negative feelings toward Petitioner.[335] Mr. Parr also expressed concern about whether a life sentence would truly be a life sentence or whether a person would be eligible for parole, and he was unsure whether he could follow the court's instructions on this issue.[336]

Mr. Terry stated that he had feelings against interracial marriage.[337]  He further stated that he believed that racial minorities were more prone to commit crime than whites, and more prone to commit violent acts than whites.[338]  Mr. Terry further stated that he believed the death penalty was warranted in most murder cases.[339] Mr. Terry also indicated he was opposed to serving as a juror.[340]

Finally, Mr. Anderson expressed extreme views on racial issues, admitted he would be biased based on Petitioner's race, and stated that he would not make his decision without regard to race.[341]  Mr. Anderson expressed negative views towards those involved in the legal system,

---

[334]*Id*. at 21.

[335]*Id*. at 26-27.

[336]*Id*. at 33.

[337]Docket No. 493, Ex. 29 at 8.

[338]*Id*. at 9.

[339]*Id*. at 32.

[340]*Id*. at 28.

[341]Docket No. 493, Ex. 30 at 8-10.

including law enforcement.[342]  Mr. Anderson stated his belief that "[p]eople that commit crimes are trash."[343]  As for defense attorneys, Mr. Anderson stated that "[t]hey try to find loopholes not whether the person is guilty or not."[344]  And prosecuting attorneys: "More power to them!"[345]  Mr. Anderson stated that he could not be fair and impartial because of the relative races of Petitioner and Mrs. Oleson.  In short, Mr. Anderson stated: "I am bias [sic] and it wouldn't be fair for me to judge him."[346]  On capital punishment, Mr. Anderson stated "[w]hen anyone takes a persons [sic] life then they should pay with their own."[347]  He further expressed his belief that Petitioner "should die for what he did,"[348] that he had no "mercy for murderers,"[349] and that Petitioner should receive "the death penalty!"[350]  In imposing the death penalty, Mr. Anderson believed that it would be the best thing for society and was cheaper than housing convicted individuals until death.[351]

---

[342]*Id.* at 10.

[343]*Id.* at 13.

[344]*Id.* at 19.

[345]*Id.*

[346]*Id.* at 21.

[347]*Id.* at 24.

[348]*Id.*

[349]*Id.* at 28.

[350]*Id.* at 29.

[351]*Id.* at 31.

A close look at the statements made by Messrs. Parry, Terry, and Anderson, especially compared to Mr. Nelson's statements, illustrates that counsel was attentive during the jury selection for the 1992 Penalty Phase Hearing, that counsel sought removal for cause in appropriate circumstances, and that counsel passed on those jurors who provided information indicating they would be fair and impartial. Based on this, the Court finds that there is a reasonable argument that counsel satisfied the *Strickland* standard. Mr. Nelson's answers to the questionnaire certainly warranted further inquiry. Those answers were appropriately explored during voir dire. In the end, Mr. Nelson stated that there was nothing in his belief system that would lead to an automatic conclusion that Petitioner must receive the death penalty. Mr. Nelson further stated that the fact that Petitioner was black would not influence his decision and that he could make his decision without regard to race. Additionally, Mr. Nelson stated that he would consider the case based on the facts and evidence presented.

Accordingly, the Court finds that there is a reasonable argument that counsel's performance was not deficient. In addition, Petitioner has provided nothing to show that he could satisfy *Strickland*'s prejudice prong. Therefore, this claim fails.

### 3. *Integrity of the Proceedings*

Petitioner's final argument under Claim VIII is that his 1992 Penalty Phase Hearing counsel was ineffective for failing to challenge the integrity of the proceedings based on the ineffectiveness of original guilt phase counsel and prosecutorial misconduct. This claim is grounded in Claims I and V, and for the reasons set forth above, this claim fails.

Petitioner also argues that counsel at the 1992 Penalty Phase Hearing should have re-argued the issue of Petitioner's guilt, stating that "[r]esidual doubt is powerful mitigating evidence."[352]  While some courts and commentators have recognized residual doubt as an effective mitigation strategy, the Supreme Court has not "interpreted the Eighth Amendment as providing a capital defendant the right to introduce at sentencing evidence designed to cast 'residual doubt' on his guilt of the basic crime of conviction."[353]

In this case, the jury was specifically informed that it would be "improper for you to again debate or reconsider the question of the defendant's guilt or innocence."[354]  This instruction is consistent with Utah Code Ann. § 76-3-207(4)—discussed below in relation to Claim XLII—which makes it clear that if a death sentence is vacated based on a sentencing error, the conviction remains intact.  Thus, Petitioner's guilt was not at issue during the 1992 Penalty Phase Hearing and the Court cannot find counsel ineffective for failing to raise an issue the jury could not consider.

F.      CLAIMS X AND XLII

With Claim X, Petitioner asserts that he was denied his right to confront and cross examine witnesses, and that his due process rights were violated when excerpts from the Tovars' 1985 trial testimony were read into the record at the 1992 Penalty Phase Hearing.  In Claim XLII,

---

[352]Docket No. 466, at 71.

[353]*Oregon v. Guzek*, 546 U.S. 517, 525 (2006).

[354]Docket No. 493, Ex. 31, Instruction No. 3.

Petitioner further argues that Utah Code Ann. § 76-3-204(4), which allowed such evidence to be introduced, is unconstitutional on its face and as applied.

     1.    *Additional Facts*

The scope of the 1992 Penalty Phase Hearing was controlled by Utah Code Ann. § 76-3-207(4) which provides, in relevant part:  "In cases of remand for new sentencing proceedings, all exhibits and a transcript of all testimony and other evidence properly admitted in the prior trial and sentencing proceedings shall be admissible in the new sentencing proceedings . . . ."[355]

Although the Tovars testified at the 1985 Trial, by 1992 they could not be located.  Prior to the start of the Penalty Phase Hearing, as recounted in *Carter II*,

> Lieutenant Pierpont testified that he had attempted to locate the Tovars "from time to time over the last few years."  His latest attempt occurred the previous day when he contacted the United States Marshall's [sic] Office.  Apparently, Pierpont knew that the United States Marshall [sic] had a warrant for Epifanio Tovar's arrest and thought that the federal authorities might have some information as to the Tovars' whereabouts.  His efforts were, however, unsuccessful.  The federal authorities still had a warrant out for Mr. Tovar's arrest but could not provide any concrete information as to his present location, other than that he might be found in Mexico or southern California.  Pierpont further testified that he was unable to locate Perla Lacayo, a friend of the Tovars who gave a statement to police in the 1985 investigation.[356]

Based on Lieutenant Pierpont's testimony, the trial court determined that the Tovars were unavailable, that the state had made a reasonable effort to locate them, and that, in their absence, a transcript of their trial testimony could be read into the record.  When presented with this issue on appeal, the Utah Supreme Court found that "the State's efforts to locate the Tovars cannot be

---

[355]Utah Code Ann. § 76-3-207(4) (1990).

[356]*Carter II*, 888 P.2d at 645.

described as exhaustive," but the trial court did not abuse its discretion in determining that they

were unavailable.[357]   Given the outstanding federal warrant for Mr. Tovar's arrest in 1992, the

Utah Supreme Court concluded there was "every likelihood that he and his wife [were] actively

avoiding both state and federal authorities" and the state's role was not simply to locate an out-

of-state witness "but to track down a fugitive from the law."[358]   The court reasoned that "[i]f the

United States Marshall's [sic] Office, with all of its resources, could not locate the Tovars over a

period of several years, we think it reasonable for the trial court to conclude that they were

unavailable to testify at the 1992 penalty hearing."[359]   Therefore, the court concluded that the

State made a good faith effort to secure the Tovars' presence the 1992 Penalty Phase Hearing and

the trial court's ruling on their unavailability and the admission of the transcript was not an abuse

of discretion.

    *2.*    *Discussion*

        *a.*    *Facial Challenge to* § 76-3-207(4)

In *Carter II*, Petitioner argued that § 76-3-207(4) was unconstitutional, both facially and

as applied to him.   In reviewing his claim, the Utah Supreme Court acknowledged that "section

76-3-207(4) impinges on a capital defendant's right to confrontation."[360]   However, the court

noted its duty to construe a statute to avoid and/or save it from constitutional conflicts or

---

[357]*Id*. at 646.

[358]*Id*.

[359]*Id*.

[360]*Carter II*, 888 P.2d at 642.

infirmities.  To this end, the court read into the section the safeguards required by *Ohio v. Roberts*[361] and adopted by the state in *State v. Brooks*.[362]  Specifically, the court held that "the party proffering the testimony must (1) show that the witness is unavailable, and (2) demonstrate that the unavailable witness's prior testimony bears sufficient indicia of reliability to permit its introduction at the later proceeding."[363]  In addition, the Utah Supreme Court added "two other procedural safeguards and one condition."[364]

> First, we construe section 76-3-207(4) as permitting the admission of prior testimony in oral form only.  Second, we hold that the written transcript should not be admitted into evidence as an exhibit, nor should it be taken into the jury room during deliberation.  The condition is simply that the defendant make a timely objection to the introduction of the transcript under section 76-3-207(4).
> . . . .
> In sum, we hold that, subject to timely objection, section 76-3-207(4) is governed by the constitutional safeguards established in *Roberts* and adopted by this court in *Brooks*.  We further hold that the transcript of all [prior] testimony contemplated by section 76-3-207(4) is admissible in oral form only and must not be introduced into evidence as an exhibit or given to the jury to use during deliberation.[365]

Despite the fact that the Utah Supreme Court's decision in *Carter II* explicitly incorporates *Roberts*, Petitioner argues that *Carter II* is contrary to clearly established federal law.  Specifically, Petitioner argues that the court's "construction is contrary to *Roberts* because it did not interpret § 207(4) to require a trial court to determine either that a witness from the

---

[361]448 U.S. 56 (1980).

[362]638 P.2d 537 (Utah 1981).

[363]*Carter II*, 888 P.2d at 646 (citing to *Brooks*, 638 P.2d at 539).

[364]*Id*. at 642.

[365]*Id*. at 642-43 (quotation marks omitted) (alteration in original).

original trial was unavailable to testify or that the prosecution had made a good-faith effort to locate the witness before allowing that witness's trial testimony to become part of the record at the resentencing."[366]

Petitioner's argument is incorrect.  The plain language in *Carter II* excerpted above shows that the Utah Supreme Court specifically read § 76-3-207(4) to include the requirements of *Roberts*, and therefore the requirements of unavailability and good faith effort to locate.[367]

Petitioner further argues that the Utah Supreme Court held that the statute "did not violate the Confrontation Clause because it permits the 'admission of prior testimony in oral form only.'"[368]  This, however, is a misreading of *Carter II*.  Petitioner's interpretation fails to appreciate the fact that the Utah Supreme Court incorporated the requirements of *Roberts* into the statute.  Therefore, Petitioner's argument about the facial failure of § 76-3-207(4) must be rejected.

>    *b.*     *Utah Supreme Court's Determination of Unavailability*

Petitioner's other two arguments concern the Utah Supreme Court's determination about the unavailability of the Tovars.  First, Petitioner argues that the Utah Supreme Court's decision was based on an unreasonable determination of the facts.  Second, Petitioner argues that, without sufficient facts concerning the Tovars' unavailability, the Utah Supreme Court's determination on this issue was contrary to clearly established law.

---

[366]Docket No. 466, at 76.  This Court notes, however, that both determinations were made by the 1992 Penalty Phase Hearing court.

[367]*Roberts*, 448 U.S. at 66.

[368]Docket No. 466, at 75 (quoting *Carter II*. 888 P.2d at 642).

Petitioner's first argument is grounded in § 2254(d)(2), which concerns unreasonable determinations of fact.  Under § 2254(d), Petitioner is entitled to relief only if the state court's determination "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[369]  Section 2254(e)(1) provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the "applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." The Supreme Court has interpreted § 2254(d)(2) to preclude a federal court from setting "aside reasonable state-court determinations of fact in favor of its own debatable interpretation of the record."[370]  Thus, though reasonable minds reviewing the record may disagree, that does not suffice on habeas review.[371]  The Tenth Circuit has stated that this "is a daunting standard—one that will be satisfied in relatively few cases."[372]

With this standard in mind, the Court considers Petitioner's argument that there was insufficient evidence during the 1992 Penalty Phase Hearing for the state court to conclude that the State had made a good-faith effort to locate the Tovars.  In *Roberts*, the Supreme Court stated that "[t]he ultimate question is whether the witness is unavailable despite good-faith efforts

---

[369]28 U.S.C. § 2254(d)(2).

[370]*Rice v. Collins*, 546 U.S. 333, 335 (2006).

[371]*Id*. at 341-42.

[372]*Byrd v. Workman*, 645 F.3d 1159, 1172 (10th Cir. 2011) (quotation marks and citation omitted).

undertaken prior to trial to locate and present that witness."[373]  "The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness."[374]

In this case, both the 1992 Penalty Phase Hearing court and the Utah Supreme Court found that the State made good-faith efforts to locate the Tovars.  This conclusion was based on the January 8, 1992 testimony of Lieutenant Pierpont, who testified as to the efforts he had taken to locate the Tovars.  Having reviewed the testimony of Lieutenant Pierpont, the Court cannot conclude that the state court's finding was unreasonable.

In addition to the testimony from Lieutenant Pierpont, counsel for Petitioner proffered the defense team's efforts to locate the Tovars.  Although Petitioner's counsel expressed his belief that the Tovars could be located, they were not located prior to the 1992 penalty hearing.[375]

Based on a review of the transcript, the Court cannot conclude that Utah Supreme Court's finding that the State had made a good-faith effort to locate the Tovars was unreasonable.  As aptly stated by the Utah Supreme Court, the efforts made by the State were not exhaustive, but that is not the standard.  Rather, it is a question of reasonableness.  The Supreme Court has observed that "[o]ne, in hindsight, may always think of other things."[376]  But "the great improbability that such efforts would have resulted in locating the witness[es], and would have

---

[373]*Roberts*, 448 U.S. at 74.

[374]*Id*. (quotation marks and citation omitted).

[375]The transcript reflects that the state court judge encouraged the parties to continue their efforts to locate the Tovars.  *See* 1992 Penalty Phase Hearing Transcript at 61-62.

[376]*Roberts*, 448 U.S. at 75.

led to [their] production at trial, neutralizes any intimation that a concept of reasonableness

required their execution."[377]

> [W]hen a witness disappears before trial, it is always possible to think of additional steps that the prosecution might have taken to secure the witness' presence, but the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising. And, more to the point, the deferential standard of review set out in 28 U.S.C. § 2254(d) does not permit a federal court to overturn a state court's decision on the question of unavailability merely because the federal court identifies additional steps that might have been taken. Under AEDPA, if the state-court decision was reasonable, it cannot be disturbed.[378]

Based on the evidence, the Court cannot conclude that the Utah Supreme Court's

determination of unavailability was based on an unreasonable determination of the facts in light

of the evidence presented.[379]

Petitioner's second argument, that the Utah Supreme Court's decision was contrary to

clearly established federal law, is largely dependent on his factual argument. As that argument

fails, so too must this one. Petitioner cites to *Barber v. Page*[380] in support of his argument that

the Utah Supreme Court's decision was contrary to clearly established law. *Barber* is

distinguishable. In *Barber*, "the State made absolutely no effort to obtain the presence" of the

witness at trial and "the sole reason why [the witness] was not present to testify in person was

---

[377]*Id*. at 76.

[378]*Hardy v. Cross*, 132 S.Ct. 490, 495 (2011) (citation omitted).

[379]This conclusion is further supported by Petitioner's new evidence, which shows that the Tovars are in Mexico and apparently have been for some time.

[380]390 U.S. 719 (1968).

because the State did not attempt to seek his presence."[381]  This is not what happened in the 1992

Penalty Phase Hearing.  There was clear evidence that the state tried to locate the Tovars for the

hearing.  Petitioner has provided nothing else to suggest that the state court's ruling on this issue

was contrary to or involved an unreasonable application of clearly established law.  Therefore,

the Court will deny Petitioner's request for habeas relief on these grounds.[382]

G.     CLAIM XI

       Petitioner argues that testimony from Dr. Howell at the 1992 Penalty Phase Hearing

violated his rights to due process and a reliable sentencing determination because Dr. Howell

failed to reveal his previous involvement with the case.[383]

       As discussed more fully in Claim VIII above, Dr. Howell provided mitigation evidence

during the 1992 Penalty Phase Hearing.  Dr. Howell testified that he had been ordered by the trial

court to conduct a psychological examination of Petitioner,[384] and that he examined Petitioner

over a number of days.[385]  Dr. Howell testified about the tests he administered to Petitioner and

the individuals to whom he spoke (such as some of Petitioner's family members).  Dr. Howell

---

[381]*Id*. at 723, 725.

[382]As a result of this ruling, the Court need not decide Respondent's argument that
Petitioner's claims fail because he has no Sixth Amendment right to confront witnesses at the
selection phase of a death penalty hearing.  *See* Docket No. 493, at 137-41.

[383]Unknown to Petitioner's 1992 counsel, seven years earlier, Dr. Howell provided the
Provo Police Department with a psychological profile of Mrs. Oleson's murderer.  At that time,
Dr. Howell stated: "I would like to continue to be consulted on this case.  I find it very
interesting."  *See* Docket No. 173, Ex. 17 at 3.

[384]1992 Penalty Phase Transcript at 1212.

[385]*Id*. at 1212-13.

testified that he had been told that Petitioner suffered more than one head injury when he was younger and that there was good evidence to support a finding of organic cerebral dysfunction and damage that could be exacerbated by substance abuse.[386]  Dr. Howell testified that the organic injury, coupled with chemical abuse, would result in impaired judgment and cognitive ability.  Dr. Howell also expressed concern about a lack of a father figure when Petitioner was growing up.

Petitioner argued, in his state habeas proceeding, that his constitutional rights were violated because Dr. Howell did not disclose the fact that he prepared a general psychological profile of Mrs. Oleson's killer in 1985.  Petitioner also argued that Dr. Howell was not qualified to examine him and that his examination was inadequate.  The trial court dismissed all of these claims.  The court found that, at most, Dr. Howell's conflict was harmless error, that Dr. Howell was qualified to testify as a mitigation expert, and his testimony was "significant, helpful, and entirely appropriate."[387]

On appeal, the Utah Supreme Court in *Carter III* held as follows:

The district court was correct in dismissing this claim.  Although Dr. Howell should have disclosed his prior involvement with the case, Carter has demonstrated no prejudice that resulted from his failure to do so.  Carter has not shown that there was other mitigation evidence that a conflict-free expert would have discovered and attested to at trial.  As the district court found, Dr. Howell presented appropriate mitigation testimony.  Because Carter has presented this court with nothing that shows that there is a reasonable probability of a different

---

[386]Though Dr. Howell initially testified that his assessment found no history of chemical abuse, *see id.* at 1231, he later testified that Petitioner had a history of alcohol and drug use, *see id.* at 1240.

[387]*Carter III*, 44 P.3d at 634.

outcome had a conflict-free expert provided mitigation testimony, we conclude that the district court properly dismissed this claim.[388]

Petitioner challenges the Utah Supreme Court's ruling on this issue. Petitioner argues that Dr. Howell's conflict deprived him of due process of law and a reliable sentencing determination.

"AEDPA 'requires federal habeas courts to deny relief that is contingent upon a rule of law not clearly established at the time the state court conviction became final.'"[389] Thus, "[w]hether the law is clearly established is *the* threshold question under § 2254(d)(1)."[390]  "[T]he threshold determination that there is no clearly established federal law is analytically dispositive in the § 2254(d)(1) analysis. That is, without clearly established federal law, a federal habeas court need not assess whether a state court's decision was 'contrary to' or involved an 'unreasonable application' of such law."[391]

Petitioner failed to show any clearly established law on the conflict issue. Nor has the Court located any in its own research. As there is no clearly established federal law on this point, the Court's consideration of this matter is at an end. Without clearly established federal law, the Court need not determine whether the Utah Supreme Court's decision with respect to Dr. Howell was contrary to or an unreasonable application of such law.

---

[388]*Id*. at 635.

[389]*House v. Hatch*, 527 F.3d 1010, 1015 (10th Cir. 2008) (quoting *Williams*, 529 U.S. at 380).

[390]*Id*.

[391]*Id*. at 1017.

Petitioner argues that Dr. Howell was not the type of expert envisioned by the clearly established federal law regarding psychiatric experts for indigent defendants as reflected in *Ake v. Oklahoma*.  However, "*Ake* held only that an indigent capital defendant must, upon request, be provided an expert for the penalty phase 'when the State presents psychiatric evidence of the defendant's future dangerousness.'"[392]  Thus, *Ake* does not speak directly to the issue before the Court and does not provide the clearly established federal law the Court would need to conduct further analysis of this argument.

In another attempt to graft clearly established federal law onto the issue of Dr. Howell's conflict, Petitioner suggests that Dr. Howell's investigation should be analyzed under *Strickland*. Petitioner argues that Dr. Howell's evaluation of Petitioner was lacking and, if that evaluation had been thorough, Dr. Howell would have discovered a wealth of mitigating evidence. Petitioner's argument, however, relies on evidence that was not before the Utah Supreme Court when it made its decision in *Carter III*, and that this Court may not consider under *Pinholster's* restrictions.[393]  Moreover, Petitioner provides no clearly established federal law that mitigation experts are subject to the *Strickland* standard.  Even if such a standard applied, Petitioner would need to show that Dr. Howell's conflict adversely affected his performance.[394]  Petitioner

---

[392]*Revilla v. Gibson*, 283 F.3d 1203, 1220-21 (10th Cir. 2002) (quoting *Ake*, 470 U.S. at 83).

[393]*Pinholster*, 131 S.Ct. at 1400.

[394]*See Strickland*, 466 U.S. at 692.

provides nothing suggesting that Dr. Howell's conflict interfered with his evaluation of Petitioner and the subsequent testimony at the 1992 Penalty Phase Hearing.[395]

Given the above, the Court denies habeas relief on Claim XI.

H.    CLAIM XXIII

Petitioner argues that his constitutional rights were violated because there was insufficient evidence for the jury in the 1992 Penalty Phase Hearing to conclude that Mrs. Oleson's murder was "especially heinous, atrocious, cruel, or exceptionally depraved." Specifically, Petitioner argues that no rational juror could conclude that Mrs. Oleson's murder was committed in a manner that satisfied the constitutional requirements for that aggravating circumstance as set forth in *State v. Tuttle*.[396]

1.    *Procedural Context*

Utah's death penalty scheme narrows the class of offenders eligible for the death penalty during the guilt phase by limiting the death penalty to first degree, or aggravated, murder.  To convict a defendant of first degree murder, the court or jury in a murder trial must find that an intentional killing occurred in the context of at least one of several enumerated aggravating

---

[395]*Carter III*, 44 P.3d at 635 ("Carter has not shown that there was other mitigation evidence that a conflict-free expert would have discovered and attested to at trial.").

[396]Docket No. 466, at 87-88.  *State v. Tuttle*, 780 P.2d 1203 (Utah 1989), establishes what must be shown under § 76-5-202(1)(q) to make it constitutionally permissible by providing a meaningful distinction between capital and non-capital murders.  Specifically, the *Tuttle* court held the evidence must show "serious physical abuse before death, but also that any such abuse evidence a mental state materially more depraved or culpable than that of most other murderers." *Id*. at 1217.

circumstances.  The killing and the aggravating circumstances must be established beyond a reasonable doubt.[397]

The jury in Petitioner's 1985 trial was instructed accordingly and was allowed to consider whether Mrs. Oleson's murder was "committed in an especially heinous, atrocious, cruel, or exceptionally depraved manner."[398]

In 1988, the Utah Legislature clarified that for a murder to be found "especially heinous, atrocious, cruel, or [committed in an] exceptionally depraved manner" those attributes "must be demonstrated by physical torture, serious physical abuse, or serious bodily injury of the victim before death."[399]

Since Petitioner did not have the benefit of that statutory language during his 1985 trial, in *Carter I*, the Utah Supreme Court found that the 1985 jury "was never properly instructed in either the guilt or the penalty phase . . . ."[400]  Thus, the court held that

the improper instructions denied this jury the opportunity to properly determine whether the mitigating factors were sufficiently strong when compared with the aggravating factors to create a substantial and reasonable doubt that the death

---

[397]Utah Code Ann. § 76-5-202.

[398]*Carter I*, 776 P.2d at 895.  The jury supported Petitioner's first degree murder conviction by finding two aggravating factors beyond a reasonable doubt: (1) that the murder was committed during an aggravated burglary and (2) that the murder was committed in an especially heinous, atrocious, cruel or exceptionally depraved manner.

[399]*Id*. at 894-95; *see also* Utah Code Ann. § 76-5-202(1)(q) (Supp. 1988).  This amendment brought the statutory language in line with *State v. Wood*, 648 P.2d 71 (Utah 1981), which was based on *Godfrey v. Georgia*, 446 U.S. 420 (1980).

[400]*Carter I*, 776 P.2d at 895.  The court sustained Petitioner's conviction for first degree murder, however, even without the aggravating factor of heinousness, because the jury had also found that the murder was committed in connection with an aggravated burglary.  *Id*.

> penalty is appropriate. . . .  Given the erroneous instruction, it is impossible for us
> to determine or presume that the jury properly performed its weighing function.[401]

The court therefore vacated Petitioner's death sentence and remanded for a new sentencing

proceeding.[402]

    On appeal from the second penalty proceeding, Petitioner argued "that the trial court

committed reversible error in permitting the 1992 penalty jury to consider the allegedly heinous

nature of the murder as an aggravating circumstance in determining his sentence."[403]

Specifically, Petitioner argued the facts of Mrs. Oleson's murder could not support a finding of

heinousness as defined by *Tuttle*.[404]

    The *Carter II* court also attributed the following argument to Petitioner: "Carter contends

that because *Carter I* reversed his *conviction* under section 76-5-202(1)(q) due to faulty jury

instructions and, impliedly, insufficiency of evidence, the 1992 penalty jury could not lawfully

consider that aggravating circumstance."[405]

    The Utah Supreme Court dismissed these arguments stating: "We are unpersuaded.  *State*

*v. Young* supports the conclusion that no error occurred here."[406]  The court also said "our

---

[401]*Id*. at 895-96.

[402]*Id*. at 896.

[403]*Carter II*, 888 P.2d at 648.

[404]*See* Docket No. 111, Addendum N, Brief of Appellant, at 108-21.

[405]*Carter II*, 888 P.2d at 648-49 (emphasis added).  This is an error.  Petitioner's sentence, not his conviction, was reversed in *Carter I*.

[406]*Id*. at 649 (citations omitted).  In *State v. Young,* 853 P.2d 327, 352 (Utah 1993), the court held that during the penalty phase the state may put on evidence, as long as it is "not

holding in *Carter I* turned on faulty language in the section 76-5-202(1)(q) jury instruction, not on the issue of whether the State presented sufficient evidence to warrant the giving of the instruction.  Thus, *Young* authorizes the trial court's decision to give the section 76-5-202(1)(q) instruction [to the 1992 Penalty Phase Hearing jury].”[407]

In the instant case, Petitioner renews his argument that there was insufficient evidence for the 1992 Penalty Phase jury to consider the aggravating circumstance of heinousness.  He argues that claim has never been reviewed on the merits and that no court has considered whether the evidence supported that instruction.[408]

### 2.      *Standard of Review*

Petitioner argues that the Utah Supreme Court in *Carter II* did not adjudicate Claim XXIII on the merits and, therefore, a de novo standard of review applies.[409]  Respondent argues

---

unfairly prejudicial,” of any and all aggravating factors listed in § 76-5-202, even if those factors were not presented to the jury during the guilt phase.  In his dissenting opinion in *Carter II*, Justice Stewart argued that the majority glossed over the evidentiary issue entirely and failed to address the issue of whether there was a factual basis for the heinousness instruction: “[N]o court has addressed the issue of whether the facts of the case meet constitutional requirements for an instruction of that type to be given.”  *Carter II*, 888 P.2d at 658 (Stewart, J. dissenting).  Justice Stewart also argued that the failure to have a threshold evidentiary standard met before an instruction is given for aggravating factors during the penalty phase has constitutional implications:  “That the instruction is given in the penalty phase does not make the error harmless.  I recognize *State v. Young* . . . states the contrary, but I do not think it is possible to square the ruling in *Young* with the rulings in *Godfrey*, *Wood*, and *Tuttle*.”  *Id*. at 659 (Stewart, J. dissenting).

[407]*Id*. at 649.  In a footnote to this sentence the Court said that because *Young* controlled, Petitioner's reliance on *Tuttle* was “misplaced.”

[408]Docket No. 466, at 86-94.

[409]Docket No. 466, at 87.  Petitioner argues that this issue was raised in his opening brief to the Utah Supreme Court in *Carter II* and that the court “expressly declined to resolve the

that Petitioner waived this argument about de novo review and that, even if not waived, Claim

XXIII fails because the Utah Supreme Court adjudicated this issue on the merits in *Carter II*.[410]

For the reasons discussed with regard to Respondent's waiver argument in Claim I, the

Court finds that Petitioner did not waive the right to raise the argument that Claim XXIII should

receive de novo review.  Nevertheless, the Court finds such an argument unpersuasive.

Based on its reading of *Carter I* and *Carter II*, the Court finds that the Utah Supreme

Court decided Claim XXIII on the merits, and therefore review under § 2254(d) is appropriate.

As described above, the clear language of *Carter II* supports the conclusion that the Utah

Supreme Court considered Petitioner's arguments about the sufficiency of the evidence and was

"unpersuaded" by them.  The court found "no error occurred here" and that "*Young* authorizes

the trial court's decision to give the section 76-5-202(1)(q) instruction."

While the Utah Supreme Court in *Carter II* does not directly state that there was

sufficient evidence to support the use of "heinousness" as an aggravating circumstance, there is

nothing in § 2254(d) requiring courts to give "a statement of reasons" for their decisions.[411]

Moreover,  "[w]hen a federal claim has been presented to a state court and the state court has

denied relief, it may be presumed that the state court adjudicated the claim on the merits in the

absence of any indication of state-law procedural principles to the contrary."[412]

—————————

merits of this claim."  *Id.*

[410]Docket No. 493, at 123.

[411]*Richter*, 131 S.Ct. at 784.

[412]*Id.* at 784-85.

110

Even if a de novo review applied,[413] however, the outcome would be the same because the Court's de novo review would be limited to the evidence that was before the trier of fact.[414] Thus, Petitioner's argument that the Court could receive additional evidence on this claim is incorrect.[415]   In any event, Petitioner has not provided any extra-record evidence for consideration in relation to this claim, and, as discussed below, the existing record supports a finding that there was sufficient evidence to allow the jury to consider the aggravating circumstance of heinousness during the 1992 Penalty Phase Hearing.

   *3.     Discussion*

Petitioner argues that the jury should not have considered the "heinous" nature of the offense as an aggravating circumstance at the 1992 Penalty Phase Hearing.  Specifically, he argues that the two witnesses at trial who provided evidence about the nature of the killing did not provide evidence sufficient to support the aggravating factor of heinousness as required by *Tuttle*.[416]

---

[413]The Tenth Circuit has held that "[w]hen the state court addresses the great bulk of the issues raised by the petitioner's brief in that court but omits to address a particular claim, we have inferred that the claim was not decided 'on the merits' in the state court" and the deferential review set forth in 28 U.S.C. § 2254(d) would not apply.  *Morris v. Burnett*, 319 F.3d 1254, 1267 (10th Cir. 2003).

[414]*McDaniel v. Brown*, 130 S.Ct. 665, 672 (2010).

[415]*See* Docket No. 466, at 88 n.41.

[416]*Id*. at 89-91.

Respondent argues that the Utah courts have already considered and denied Petitioner's claim about the sufficiency of the evidence for the aggravating factor of heinousness as applied during sentencing, and that they did so in compliance with clearly established federal law.[417]

In *Carter II,* the Utah Supreme Court considered Petitioner's claim about the sufficiency of evidence for the jury seated in the 1992 Penalty Phase Hearing to consider the aggravating circumstance of the heinousness instruction in § 76-5-202(1)(q). And it clearly stated that *Young* authorized the trial court's decision to allow that instruction and, therefore, Petitioner's arguments about *Tuttle* and the sufficiency of evidence were "misplaced." Petitioner's reliance on *Tuttle* is misplaced not because of the facts or law in *Tuttle*, but because of the very nature of Utah's criminal code for capital cases.

Petitioner points to the *Carter II* court's language about *Tuttle* as evidence that the court did not decide his evidentiary claim on the merits. But by saying that Petitioner's reliance on *Tuttle* was misplaced, the *Carter II* court simply emphasized the fact that it made its determination about the merits of his claim on completely different grounds, namely its decision in *Young*.

---

[417]Docket No. 493, at 123-24. Respondent also argues that Petitioner's concern about the sufficiency of the evidence for the heinousness factor is misplaced because the only point at which the sufficiency of the evidence for the aggravating factor matters is during the guilt phase, the point at which, under Utah law, Petitioner was determined to be eligible for the death penalty. The sufficiency of the evidence as it relates to aggravating factors at the penalty phase is "irrelevant."

In *Young*, the court held that "factors not presented at the guilt phase may be presented during the penalty phase"[418] and that "all aggravating evidence not unfairly prejudicial to the accused may be presented during the penalty phase of a capital proceeding."[419]  The *Young* court noted that by drafting Utah Code Ann. § 76-3-207(2) and (3) as it did, the legislature clearly intended for aggravating circumstances, without limitation, to be considered during the penalty phase, "even when the factors were not introduced during the guilt phase of the trial."[420]

By relying on *Young*, and not *Tuttle*, to resolve Petitioner's claim on the merits, the Utah Supreme Court highlights the different functions that aggravating circumstances serve in Utah's capital cases.[421]  At the guilt phase, the *finding* of an aggravated circumstance under § 76-5-202-(1), for the purpose of determining whether an intentional killing is first degree murder, is a factual determination that requires an evidentiary standard of beyond a reasonable doubt.  The kinds of aggravating circumstances that a jury may consider are clearly delineated.  At the penalty phase, the *consideration* of an aggravating circumstance under § 76-3-207 is a part of an equitable weighing analysis wherein the jury (or court) considers "the totality of the aggravating

---

[418]*Young*, 853 P.2d at 352.

[419]*Id*.

[420]*Id*.

[421]As Petitioner notes, the *Tuttle* court acknowledges these two separate functions and adopts "a single interpretation [of § 76-5-202(1)(q)] that can perform both functions constitutionally."  *Tuttle*, 780 P.2d at 1216.  Given that the jury in the penalty phase weighs the "totality of the aggravating and mitigating circumstances," determining whether *Tuttle*'s standards are met during the penalty phase would be very difficult, if not impossible, absent a supplemental instruction or special verdict form that required the sentencing jury to delineate which aggravating circumstances it used to impose the death penalty.  The court refused to do either in Petitioner's case.  *See* Docket No. 111, Addendum N, Brief of Appellant, at 134-35.

and mitigating circumstances"[422] to determine the appropriate sentence.  It is the sentence that must be established beyond a reasonable doubt, not a particular aggravating circumstance.[423]

The language in Utah's capital sentencing statute is permissive and covers a range of factors.  "Evidence *may* be presented on:"[424] the nature and circumstances of the crime;[425] the defendant's character, background, history, and mental and physical condition;[426] the victim and the impact on the victim's family and community;[427] and "any other facts in aggravation or mitigation of the penalty that the court considers relevant to the sentence."[428]  Here, "[a]ggravating circumstances include, but are not limited to, those outlined in Section 76-5-202."[429]  That the sentencing statute envisions a more expansive and equitable view of the evidence than may be considered at the guilt phase is underscored by the discretion given to the trial court to admit evidence: "*Any* evidence the court considers to have *probative force* may be received regardless of its admissibility under the exclusionary rules of evidence."[430]

---

[422]Utah Code Ann. § 76-3-207(5)(b).

[423]*Id*.

[424]*Id*. § 76-3-207(2)(a) (emphasis added).

[425]*Id*. § 76-3-207(2)(a)(i).

[426]*Id*. § 76-3-207(2)(a)(ii).

[427]*Id*. § 76-3-207(2)(a)(iii).

[428]*Id*. § 76-3-207(2)(a)(iv).

[429]*Id*. § 76-3-207(3).

[430]*Id*. § 76-3-207(2)(b) (emphasis added).

It is against this backdrop that the Court considers under § 2254(d) whether *Carter II*'s resolution of Petitioner's claim violates clearly established federal law or is based on an unreasonable determination of the facts.

Clearly established federal law requires that there be a meaningful distinction between those murders punishable by death and those that are not.[431]  Narrowing the class of death-eligible persons, and thereby channeling the jury's discretion, may occur at either the guilt or penalty phase of a capital trial.[432]   In Utah, this narrowing is done at the guilt phase.  Utah law provides that aggravated, or first degree, murder may be a capital offense and to convict a defendant of aggravated murder the jury must find, beyond a reasonable doubt, that there was an intentional or knowing killing that was committed during the course of at least one of the statutorily delineated aggravating circumstances.[433]

The evidentiary standard at Utah's sentencing phase is a liberal one.  "[A]ll aggravating evidence not unfairly prejudicial to the accused may be presented during the penalty phase of a capital proceeding."[434]  Thus, once the jury finds that a defendant is within the legislatively defined, and constitutionally narrowed, class of persons eligible for the death penalty, "the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among [the] class [of persons eligible for the death penalty], those defendants

---

[431]*See Zant v. Stephens*, 462 U.S. 862, 877 (1983); *Godfrey,* 446 U.S. at 427; *Gregg v. Georgia,* 428 U.S. 153, 188 (1976); *Furman v. Georgia*, 408 U.S. 238, 313 (1972).

[432]*Lowenfield v. Phelps*, 484 U.S. 231, 244-45 (1988).

[433]Utah Code Ann. § 76-5-202.

[434]*Young*, 853 P.2d at 352.

who will actually be sentenced to death."[435]   Thus, *Carter II*'s determination that the jury in the 1992 Penalty Phase Hearing properly considered the aggravating circumstance of heinousness did not violate clearly established federal law.

Nor is *Carter II* a decision based on an unreasonable determination of the facts.  Even analyzed under the *Tuttle* standard, the facts support the jury's consideration of the aggravating circumstance of heinousness.  The trial court judge in the 1992 Penalty Phase Hearing made such a determination when he denied Petitioner's motion to exclude the heinousness instruction.[436] The Utah Supreme Court affirmed that decision.[437]   Any review of those decisions, which this Court does not need to conduct, would be a deferential one to determine whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact" could have made the same finding.[438]

In *Tuttle*, the court reviewed a first degree murder conviction that was supported by the jury's finding of the single aggravating circumstance of heinousness and concluded that the record did not contain any evidence that the defendant had  "intended to do or in fact did anything but kill his victim by stabbing her."[439]   The court found "there is absolutely no evidence

---

[435]*See Zant*, 462 U.S. at 878.

[436]*See* Docket No. 111, Addendum N, Brief of Appellant, at 110.  The trial court concluded that *Tuttle* "is distinguishable on its facts and that upon proper instruction the penalty Jury should be permitted to consider . . . the aggravating circumstance" of heinousness.  *Id.*

[437]*Carter II*, 888 P.2d at 637.

[438]*See Lewis v. Jeffers*, 497 U.S. 764, 781-82 (1990) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

[439]*Tuttle*, 780 P.2d at 1218.

that Tuttle had a quicker and less painful method available to him"[440] or that he "intentionally refrained from administering one wound that would have caused instantaneous death in favor of a number of wounds that would prolong the victim's life and suffering."[441]  Based on those considerations, the lack of a confession, and that the state put on nothing but "circumstantial evidence," the *Tuttle* court concluded that the facts did not support a finding beyond a reasonable doubt of an aggravating circumstance under § 76-5-202(1)(q), and therefore the court reduced the defendant's conviction from first degree murder to second degree murder.[442]

In Petitioner's case, the very same factual analysis the Utah court conducted in *Tuttle* supports consideration of the aggravating circumstance of heinousness.  Unlike *Tuttle*, the facts, when viewed in the light most favorable to the prosecution, show that Petitioner did intend to do something other than just kill Mrs. Oleson:  He intended to rape her and burglarize her home.  To this end, Petitioner terrorized Mrs. Oleson by tying her up with a telephone cord ripped from the wall, forcing her to the ground, and taking off her pants, underwear, and sanitary pad.  Also unlike *Tuttle*, the evidence showed that Petitioner had a gun that would have administered an instantaneous death, but instead he violently and repeatedly stabbed her.  He only used the gun after perusing the house for items to steal, and, even then, had to fire it several times.

Accordingly, the *Carter II* court's determination regarding the aggravating circumstance of heinousness at the 1992 Penalty Phase Hearing did not violate clearly established federal law,

---

[440]*Id.*

[441]*Id.* at 1218-19.

[442]*Id.* at 1219.

nor did it result in a decision based on an unreasonable determination of the facts.  Therefore, Claim XXIII does not provide a basis for habeas relief.

I.      CLAIMS XVI AND XVIII

Claims XVI and XVIII assert that the cumulative effect of errors in the 1985 trial, 1992 penalty phase, and the appeals from both deprived Petitioner of a fair trial and a fair and reliable sentencing determination.

"A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless."[443]

As discussed above in Claim I, there is a strong argument that the Utah Supreme Court in *Carter I* erred in its determination of the performance prong of Plaintiff's ineffective assistance claim.  However, Petitioner has failed to show prejudice.  Therefore, any error on the performance prong would be harmless.  Having found no additional errors, the Court must reject Petitioner's cumulative error claim.  The Court is mindful, however, of the *Brady* and *Napue* claims pending below in state court, and notes the outcome of a cumulative error analysis may be different in the future.

---

[443]*Brown v. Sirmons*, 515 F.3d 1072, 1097 (10th Cir. 2008) (quotation marks and citations omitted).

V.  CONCLUSION

Based on the above, it is therefore

ORDERED that Petitioner's Petition for Writ of Habeas Corpus (Docket No. 154) is

DENIED.  It is further

ORDERED that Respondent's Motion to Strike (Docket No. 480) is DENIED.

The Clerk of the Court is directed to close this case forthwith.

DATED September 11, 2012

BY THE COURT:

_____
TED STEWART
United States District Judge

119